Annette M. HENDRIX, Individually and as Next Friend of Richard M. Hendrix and Pamela Kay Hendrix, Minors, James R. Hendrix, Sr., Frankie M. Hendrix, Roseanne Burgland, Individually and as Next Friend for Eric Burgland, Cynthia Burgland, and Angela Burgland, Minors, Merlin E. Burgland and Wilma J. Burgland

v.

BELL HELICOPTER TEXTRON INC., Bell Helicopter Co., a Division of Textron Inc., and Bell Helicopter Textron, a Division of Textron Inc., Delsea Fasteners, Inc., American Monarch Company, and XYZ Corporation and/or Corporations.

Civ. A. No. 4–84–271–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

May 23, 1986.

Bob Scofield, Denton, Tex., and Burt Berry, Dallas, Tex., for plaintiffs.

R. David Broiles, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION

MAHON, District Judge.

Plaintiffs bring this action against Bell Helicopter Company, a Division of Textron, Inc. ("Bell") because of the death of James R. Hendrix, Jr. and Andrew W. Burgland on July 8, 1982. The Court bifurcated the issues of liability and damages. The issue of liability was tried before the Court sitting without a jury on January 27–29, 1986. Because the Court holds today that Bell is not liable to plaintiffs for the death of both James R. Hendrix, Jr. and Andrew W. Burgland, there will be no trial on the issue of damages. Having carefully considered all the evidence, the record and the applicable law, the Court now enters the following findings of fact and conclusions of law.

### Findings of Fact

1. On July 8, 1982 Army Captain Andrew W. Burgland and Army Sergeant James R. Hendrix, Jr. were killed when the UH–1H helicopter, serial number (S/N) 73–21825, on which they were aboard crashed shortly after takeoff in Hanau, Germany.

2. Annette M. Hendrix Battles is the surviving spouse of James R. Hendrix, Jr., and the mother and next friend of Richard M. Hendrix and Pamela K. Hendrix, the minor children of James R. Hendrix on whose behalf she brings this action. James R. Hendrix, Sr. and Frankie M. Hendrix are the surviving parents of James R. Hendrix, Jr. These five plaintiffs are the sole beneficiaries entitled to bring this action on account of the death of James R. Hendrix, Jr.

3. Roseanne Burgland is the surviving spouse of Andrew W. Burgland, and is the mother and next friend of Eric Burgland, Cynthia Burgland and Angela Burgland, the minor children of Andrew W. Burgland on whose behalf she brings this action. Merlin E. Burgland and Wilma J. Burgland are the surviving parents of Andrew W. Burgland. These six plaintiffs are the sole beneficiaries entitled to bring this action on account of the death of Andrew W. Burgland.

4. Textron, Inc. is a Delaware corporation with its principal place of business in Rhode Island. Through its division Bell Helicopter Company, Textron manufactured and sold to the United States Army Aviation Systems Command UH–1H helicopter, S/N 73–21825 on January 2, 1975.

5. According to the Army accident reports, the accident was caused by the failure of a scissors lever pivot bolt in the scissors and sleeve assembly mounted on UH–1H helicopter, S/N 73–21825. The helicopter was approximately 200 feet above ground level during a takeoff climb when the bolt failed. As a result, there was a total loss of control due to the red main rotor blade becoming an uncontrollable, free-feathering blade responding only to aerodynamic forces. The aerodynamic forces acting on the uncontrollable blade caused the main rotor system to flap excessively, resulting in the failure of the mast due to mast bumping, separation of the main rotor system from the aircraft and the aircraft crashing to the ground in a near vertical position.

6. The bolt which failed was a NAS464–P8–90 bolt. The bolt failed due to a manufacturing defect by a company unknown to the parties.

7. The scissor and sleeve assembly on helicopter S/N 73–21825 when the crash occurred was part number (P/N) 204–011–401–11, S/N Q19–5027. This assembly was installed on the aircraft on January 19, 1982 2.2 hours prior to the accident at New Cumberland Army Depot pursuant to Technical Manual No. TM 55–1520–210–23–1.

8. Technical Manual No. TM 55–1520–210–23–1 sets forth the overhaul and retirement schedule for operating equipment on, *inter alia*, UH–1H helicopters. The manual requires the scissor and sleeve assembly, P/N 204–011–401–11, to be overhauled every 1200 hours and the scissors lever pivot bolts, NAS464–P8–90, contained

therein to be retired and replaced every 600 hours.

9. Scissor and sleeve assembly, P/N 204–011–401–11, S/N Q19–5027, was originally installed on UH–1H helicopter S/N 70–15727. This helicopter was delivered by Bell to the U.S. Army on February 25, 1971 pursuant to government contract DAA-JO1–69–C–0028.

10. On February 11, 1972, helicopter S/N 70–15727 had 592 flight hours on it. At this time, all NAS464–P8–90 bolts on scissor and sleeve assembly P/N 204–011–401–11, S/N Q19–5027 were retired and replaced with new NAS464–P8–90 bolts.

11. On December 1, 1972, helicopter S/N 70–15727 had 1093 flight hours on it. At this time, scissors and sleeve assembly P/N 204–011–401–11, S/N Q19–5027 was removed from the helicopter.

12. Subsequent thereto, in 1978, scissors and sleeve assembly P/N 204–011–401–51, S/N Q19–5027, was overhauled at New Cumberland Army Depot and on January 19, 1982, it was installed on UH–1H helicopter S/N 73–21825. Sometime during this period, all NAS464–P8–90 bolts on scissors and sleeve assembly P/N 204–011–401–11, S/N Q–19–5027 were retired and replaced with new NAS464–P8–90 bolts. It was one of these new NAS464–P8–90 bolts that failed 2.2 flight hours after installation.

13. UH–1H helicopter S/N 73–21825 originally had installed on it scissors and sleeve assembly P/N 204–011–401–11, S/N RR19–0493. This assembly was removed from UH–1H helicopter S/N 73–21825 at some unknown time prior to the accident.

14. Prior to June 30, 1972, the United States Army Aviation Systems Command issued a Request for Quotation No. DAAJ01–72–Q–0380 for the production of 120 UH–1H helicopters and an option for 160 more. On June 30, 1982 Bell submitted a Proposal for Procurement of FY–93 UH–1H helicopters conditioning price upon the recognition that the contemplated contract was a follow-on procurement of similar items procured under prior contracts without any changes required.

15. On March 15, 1973, the Army contracted with Bell, Contract DAAJ01–73–C–0200, for the manufacture of UH–1H helicopters in strict accordance with the requirements of the Contractor's Model Specification Number 205–947–135 dated March 2, 1970 entitled "Detail Specification for Model UH–1H Utility Helicopter" with approved changes thereto current as of date of contract, and top assembly drawing number 205–900–02, current as of date of contract.

16. Any deviation from the approved design specifications had to be submitted to the Army and approved by the Army in accordance with MIL–STD–480 by submitting an Engineering Change Proposal (ECP) or by submitting a request for deviation/waiver on DD Form 1694.

17. Contract DAAJ01–73–C–0200 was certified for National Defense under DMS Regulation No. 1 rating DA–01.

18. Contractor's Model Specification Number 205–947–135 requires the UH–1H helicopters to be manufactured in accordance with BHC Drawing 205–900–002. BHC Drawing 205–900–002 is the general arrangement Helicopter Assembly and Auxiliary Equipment Kits for the final assembly of a UH–1H helicopter and calls for Scissors and Sleeve Assembly Drawing, Number 204–011–401–11.

19. Scissors and Sleeve Assembly Drawing Number 204–011–401–11 required the installation of two NAS464–P8–90 bolts in the scissor and sleeve assembly.

20. UH–1H helicopter S/N 73–2185 was built pursuant to government contract DAAJ01–73–C–0200 and delivered to the Army on January 2, 1975 after the Army accepted the helicopter as conforming to the contract by issuing Form DD250 No. 74–C0396 on November 23, 1974.

21. After delivery of UH–1H helicopter, S/N 73–21825 and prior to the accident, Bell submitted two engineering change proposals (ECPs) to the Department relating to the use of NAS464–P8–90 bolts in UH–1 helicopters.

22. On March 3, 1975, Bell submitted ECP 811 to sixty-one agencies of the United States military to replace the NAS464–P8–90 bolts in the primary controls of, *inter alia*, UH–1H helicopters with Bell standard bolts. Bell informed these government military branches of a possible failure in the NAS bolts because some of the bolts had been found to be lacking in adequate quality control. Specifically, a problem had been discovered relating to improper cadium plating baking and resulting hydrogen embrittlement during the manufacturing of the bolt. ECP 811 was intended to eliminate the possible failure of the NAS bolts due to hydrogen embrittlement by exercising more stringent quality controls governing approved sources of primary control bolts.

23. On May 29, 1975, the Department of the Army disapproved ECP 811. On June 24, 1975, the Department of the Navy disapproved ECP 811.

24. On the ECP form is a space in which to enter the appropriate engineering justification code. MIL–STD 480 provides for nine different codes. Code "O" means the requested change is for operational and logistic support requirements. Code "S" means the requested change is required to eliminate a hazardous condition. In practice, the use of an "S" code would require grounding the entire fleet immediately. Bell has never submitted an ECP with an "S" code.

25. ECP 811 had an "O" justification code. This was the correct code to be used given (1) that prior to this date, there had never been an accident caused by the failure of a NAS464–P8–90 bolt; (2) Bell had no prior knowledge of any damages or defects in the bolt; and (3) after the Department of the Army concluded that the accident in question was due to a manufacturing defect in the NAS bolt, it did not ground its fleet.

26. On September 30, 1975 Bell submitted ECP 885 to again replace these NAS464–P8–90 bolts with Bell standard bolts. ECP 885 was submitted in response to Field Service reports by commercial customers of two incidents of broken scissors pivot bolts on Model 212 commercial helicopters due to short thread lengths in the bolts that allowed the nut to bottom-out before proper torque could be achieved. In 1974, Bell submitted Service Bulletins to both its military and commercial customers alerting them of this potential problem and setting forth the procedure to determine proper torque to avoid the problem. ECP 885 was intended to eliminate the possible failure of the NAS bolts by insuring that the bolts would have sufficient thread length to preclude the nut from bottoming-out. This proposal properly had an "O" justification code.

27. On January 14, 1976, the Department of the Air Force disapproved ECP 885. On July 1, 1976, the Department of the Navy disapproved ECP 885. The Department of the Army never responded to ECP 885.

28. On September 29, 1976, Bell issued a Service Bulletin to its commercial customers requesting that at the next 1,000-hour inspection the NAS rotating control bolts, including NAS464 bolts, be replaced with Bell standard bolts. The purpose of this bulletin was to provide bolts with Bell Helicopter controlled design and quality standards. This Service Bulletin, as with all Service Bulletins, was sent to the United States military branches.

29. Neither UH–1H helicopter, S/N 73–21825 nor UH–1H helicopter, S/N 70–15727 were returned to Bell or serviced by Bell after they were delivered to the U.S. Army.

30. No other accident has ever occurred because of a failure of an NAS464–P8–90 bolt. In fact, all of the government's UH–1 helicopters in operation today are equipped with NAS464–P8–90 bolts in their primary controls.

31. The Court finds that Bell did everything it could do to cause the replacement of the NAS464–P8–90 bolts in the primary controls of the UH–1 helicopters with its own standard bolts.

32. Any finding of fact that should be a conclusion of law is hereby made a conclusion of law.

### Conclusions of Law

1. Bell maintains that it is not liable to plaintiffs because (1) of the government contractor defense and (2) it has no duty as a military contractor to warn or notify the government of possible product changes or improvements which might make the product safer after the product has been delivered and accepted by the government. Bell further maintains that even if it were under such a duty to warn or notify the government, it has properly fulfilled this duty by submitting to the government ECPs 811 and 885 as well as all of its commercial service bulletins.

2. In *Bynum v. FMC Corp.*, 770 F.2d 556 (5th Cir.1985), the Fifth Circuit recently adopted the government contractor defense as set forth in *McKay v. Rockwell International Corp.*, 704 F.2d 444 (9th Cir.1983), *cert. denied*, 464 U.S. 1403, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). *McKay* establishes a four-part test for the applicability of the government contractor defense to military contractors. Under this test, a supplier of military equipment is not liable for design defects where:

(1) the United States is immune from liability under the *Feres-Stencel* doctrine;[1]

(2) the United States established or approved reasonably precise specifications for the allegedly defective military equipment;

(3) the equipment conformed to those specifications; and

(4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States.

704 F.2d at 451.

3. This defense is based on the recognition that courts are ill-equipped to second guess military judgments and is rooted in the separation of powers doctrine in the Constitution. As the Supreme Court stated in *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973):

[I]t is difficult to conceive of an area of government activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.

*Id.* at 10, 93 S.Ct. at 2445.

This principal is particularily applicable when the design of military products are at issue. As the Fifth Circuit stated in *Bynum:*

Litigation involving defective designs in military products would take the identical form regardless of whether the named defendant happens to be the government or the military contractor. In either case, members of the armed services would be allowed to question military decisions and obtain relief from actions of military officials. Moreover, civilian courts would be compelled to second-guess professional military judgment, at least, the proper equipping of the armed services. As noted [above], there are few areas of government activity in which courts have less competence or that raise such significant separation of powers concerns.

770 F.2d at 665 (citations omitted).

Other policy reasons for this defense include (1) that imposing liability on military contractors for defective designs supplied by the government would circumvent the government's immunity under the *Feres-Stencel* doctrine because military suppliers would pass the costs of such liability off on the United States; (2) that military contractors are unable to alter the design specifications of their military products; and (3) closely related, an innocent contractor should not, out of fairness, be ultimately

---

**1.** Under *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), a serviceman may not recover against the government for injuries sustained in active duty. This holding was extended in *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), to prohibit the imposition of liability for a serviceman's injuries on the government indirectly through an indemnity action.

liable for design defects not within their control. For a discussion of these policy concerns, see *Bynum*, 770 F.2d at 564–66 and the authorities cited therein.

■ 4. The first element of the *McKay* test is not in dispute. Both parties agree that Andrew Burgland and James Hendrix, Jr. were members of the armed services at the time of the accident and that the accident was service related.

■ 5. The Court finds that the second element of the *McKay* test has been satisfied. The UH–1H helicopter, S/N 73–21825 was manufactured under production contract DAAJO1–73–C–0200, in which the precise specifications were established or approved by the government. Bell was obligated to manufacture the helicopter in strict accordance with these specifications and had no authority to deviate from the approved design specifications without first obtaining approval from the Army. *See Hickman Sea Sled Co.*, 57–1 BCA 3189 (ASBCA No. 3008 Navy Appeals Panel, 1957); *E.L. Cournand & Co., Inc.*, 60–2 BCA 14,731 (ASBCA No. 2955, Navy Appeals Panel, 1960).[2] Failure to follow these specifications and drawings would constitute a default under the contract.

6. Furthermore, because contract DAAJO1–73–C–0200 was certified for national defense and rated DO–A1, Bell was compelled under the Defense Production Act of 1950, 50 U.S.C., App. § 2061, *et seq.*, to perform under the contract.

Section 101(a) of the Act provides that:

The President is authorized (1) to require that performance under contracts or orders (other than contracts of employment) which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order, and, for the purpose of assuring such priority, to require acceptance and performance of such contracts or orders in preference to other contracts or orders by any person he finds to be capable of

their performance, and (2) to allocate materials and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense.

50 U.S.C., App. § 2071(a). Section 2073 goes on to state that anyone who violates the Act will be subject to criminal penalties. 50 U.S.C., App. § 2073.

Therefore, Bell was obligated, under penalty of law, to produce the UH–1H helicopter in issue in strict compliance with the established or approved precise specifications called for by the Army which included installation of NAS464–P8–90 bolts in the scissor and sleeve assembly.

7. The Court finds that the third element of the *McKay* test has been satisfied. Contract DAAJO1–73–C–0200 provided for the use of Form DD250 for the inspection and acceptance of the procured product. The contract also incorporated Standard Form 32, General Provisions of the Armed Services Procurement Regulation (ASPR) which with respect to inspection provided in section 7–103.5(d) that:

The inspection and test by the Government of any supplies or lots hereof does not relieve the Contractor from any responsibility regarding defects or other failures to meet the contract requirements which may be discovered prior to acceptance. Except as otherwise provided in this contract, acceptance shall be conclusive except as regards latent defects, fraud or such gross mistakes as amount to fraud.

32 C.F.R. § 7–103.5(d) (1958).

8. On November 23, 1974, the Bell Plant Activity representative for the United States Army issued Form DD250 No. 74–CO396 accepting UH–1H helicopter, S/N 73–21825. On the form it states: "Acceptance of listed items has been made by me and under my supervision and they conform to the contract except as noted herein

**2.** The fact that Bell was involved in the design of the UH–1H helicopter 15 years prior to the award of contract DAAJO1–73–C–0200 has no relevance on Bell's liability in this case. Under the production contract in issue, Bell's sole obligation was to strictly comply with the terms of the procurement contract in manufacturing the requested product.

or on supporting documents." There were no exceptions.

Plaintiff failed to present any evidence that the government's acceptance of UH–1H helicopter, S/N 73–21825 was not correct. Absent such proof, the Court finds that pursuant to the contract and ASPR 7–103.5, the DD250 acceptance conclusively established that UH–1H helicopter, S/N 73–21825 conformed to the contract specifications. *See Merchants National Bank of Mobile v. United States*, 689 F.2d 181, 182, 231 Ct.Cl. 563 (1982); *Genuine Motor Parts of Pennsylvania, Inc.*, 76–1 BCA 56,814 (ASBCA No. 19063 1976); *A. Brown & Co., Inc.*, 73–2 BCA 48,172 (GSBCA Nos. 3575, 3700 1973); *Environmental Tectonics Corp.*, 73–1 BCA 47,028 (VACAB No. 1032 1973).

9. With respect to the fourth element of the *McKay* test, the Court finds that Bell knew of no dangers in the procured product, either patent or latent, about which the government did not know. Plaintiffs presented no evidence that Bell failed to warn the government of any dangers associated with the use of NAS464–P8–90 bolts in the scissors and sleeve assemblies that were known to Bell prior to the time of contracting and prior to the date of acceptance which were not communicated to the government.

Plaintiffs rest solely upon events subsequent to delivery. Specifically, plaintiffs rely upon Bell's failure to put an "S" code in their ECPs and upon Bell's alleged failure to give to the government safety notices which Bell gave to its commercial operators to replace NAS464 bolts with Bell standard bolts.

■ 10. The Court finds plaintiffs' reliance on post-delivery events to be misplaced. The duty of the military contractor to warn the government about any defects in the specifications or use of the equipment which was known to the military contractor but not the government must be judged at the time of contracting and delivery of the procured product. The reason for this is clear. In order for the government to balance the risks and benefits inherent in the use of the product, the government must be made aware of any known defects in the product prior to its intended use of the product. *See McKay*, 704 F.2d at 451.

11. The holding in No. 10 *supra* is also consistent with products liability law in Texas regarding the duty to warn. In Texas, a manufacturer generally does not have a duty to warn about hazards discovered after a product has been manufactured and sold. *See Syrie v. Knoll International*, 748 F.2d 304, 311 (5th Cir.1984). An exception to this rule is when the manufacturer regains a significant degree of control over the product after it has been sold to enable it to cure the defect. *See id.; see also Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1979, writ ref. n.r.e.).

Plaintiffs presented no evidence that Bell regained some measure of control over the UH–1H helicopters that would enable it to cause the replacement of the NAS464–P8–90 bolts in the scissors and sleeve assembly with Bell standard bolts. In fact, the evidence clearly establishes that Bell exercises absolutely no control over a UH–1H helicopter after it is accepted by the government. The United States Army does all its own maintenance and overhaul of its UH–1H helicopters. The defective NAS464–P8–90 bolts which caused the crash was installed in the scissors and sleeve assembly at the New Cumberland Army Depot 2.2 flight hours before the accident.

■ Therefore, the Court finds that Bell was under no duty to warn the government about hazards discovered in the use of NAS464–P8–90 bolts in the primary controls of UH–1 helicopters after the helicopters were manufactured and accepted by the government and as such, Bell was under no duty to submit ECPs or send safety notices to the government.

12. Assuming, *arguendo*, that Bell was under a continuing duty to improve the product by submitting ECPs and safety notices to the government, the Court finds that Bell faithfully discharged this duty and was not negligent in any way. The two ECPs submitted by Bell regarding the

NAS464–P8–90 bolt informed the government in a clear and intelligible manner of the perceived problem. This is all that was required by Bell. Bell was not required, as plaintiffs claim, to put an "S" code on the ECP. In fact, the use of an "S" code would have been improper. As stated earlier, an "S" code would have required the immediate grounding of the entire UH–1 fleet. Bell has never submitted an ECP with an "S" code and the Army would have likely either changed or disregarded such a warning given that after the cause of the accident was determined, the Army did not, and to this date, does not use Bell standard bolts in the primary controls instead of NAS464–P8–90 bolts.

13. As to plaintiffs' claim that Bell failed to give to the government the safety notices that Bell gave to its commercial operators, the Court finds it to be without merit. At trial, Bell testified that it told the Army more than it did its commercial operators concerning the use of Bell standard bolts by submitting two ECPs and copies of all Service Bulletins sent to its commercial operators. Because Bell did not have at trial copies of the transmittal letters to the military branches regarding the Service Bulletins, counsel for plaintiffs implied that the Service Bulletins were not in fact sent to the government. After the trial, the Court reopened the evidence, without objection by plaintiffs, to admit the transmittal letters of the Service Bulletins sent to the various military branches. *See* Order dated March 19, 1986 admitting defendant's exhibit number 41 into evidence. Thus, the evidence is clear that Bell did tell the Army more than it told its commercial operators regarding the problems with the use of NAS464–P8–90 bolts in the primary controls of certain models of Bell helicopters.

14. Bell is not liable to the plaintiffs because it has established all four elements of the *McKay* formulation of the government contractors defense.

15. Bell is not liable to plaintiffs on any theory of strict liability, negligence, or for any willful act or omission or gross negligence in connection with any warnings it gave the Untied States Army, or in communicating any information to the United States Army concerning design improvements it made to its commercial fleet, or in not submitting a safety classification ECP to replace NAS bolts with Bell standard bolts.

16. Any conclusion of law that should be a finding of fact is hereby made a finding of fact.

A judgment will be entered accordingly.

### JUDGMENT

This action came on for trial before the Court, Honorable Eldon B. Mahon, U.S. District Judge, sitting without a jury. The issues having been duly heard, and the Court having rendered an opinion, it is ORDERED and ADJUDGED that plaintiff take nothing and that the action be dismissed on the merits. Each party is to bear its own costs of action.