**Kari Johnson SUNDSTROM, et al., Plaintiffs,**

v.

**McDONNELL DOUGLAS CORPORATION, et al., Defendants.**

No. C–91–0316 MHP.

United States District Court, N.D. California.

Jan. 6, 1993.

John J. Ruprecht, Fort Bragg, CA, Sam D. Delich, Flynn Delich & Wise, San Francisco, CA, for plaintiffs.

Marvin D. Morgenstein, Lisa M. Frlekin, Morgenstein & Jubelirer, San Francisco, CA, Percy Anderson, Bryan Cave, Los Angeles, CA, for McDonnell Douglas Corp.

Lisa M. Frlekin, Morgenstein & Jubelirer, Robert C. Gebhardt, Bronson Bronson & McKinnon, San Francisco, CA, for General Dynamics Corp.

## MEMORANDUM AND ORDER

PATEL, District Judge.

This is a wrongful death action alleging design defect, manufacturing defect, negligence and failure to warn. The action arises out of the death of plaintiffs' decedent, Air Force Captain Steven C. Sundstrom, when he ejected from his F–16 fighter jet after a head-on collision with another F–16 jet during a test flight over Germany.

On October 11, 1991, defendants moved for summary judgment that this action is barred as a matter of law under the doctrine of government contractor immunity enunciated by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518–19, 101 L.Ed.2d 442 (1988). By Memorandum and Order dated January 7, 1992, the court granted defendants partial summary judgment on the first two prongs of *Boyle*. On that date, the court also granted plaintiffs' Rule 56(f) motion for further discovery on the third, duty to warn, prong of the *Boyle* defense. On July 10, 1992, the court ordered all parties to file briefs by November 20, 1992 presenting excerpts from the depositions of Charles Gene Spriggs, George Larson and Jerry Kennedy of defendant General Dynamics ("GD"), A.B. McDonald of defendant McDonnell–Douglas Corporation ("MDC") and Robert Billings of the United States Air Force ("Air Force").

In light of the deposition testimony of these witnesses, the matter is now before the court for a ruling on the third prong of the government contractor immunity defense. In addition, based on the lack of personal knowledge evident from Mr. McDonald's deposition testimony, plaintiffs have requested that the court consider (1) striking the declarations of Mr. McDonald filed by MDC, (2) sanctioning Mr. McDonald and MDC's attorney, (3) reconsidering the partial summary judgment rulings as to MDC and (4) striking the contractor immunity defense as to MDC. Plaintiffs now also argue that the evidence in the record raises a "pure" manufacturing defect issue which precludes granting summary judgment in this action based on the *Boyle* defense.

Having considered the submissions and arguments of the parties, and for the reasons explained below, the court GRANTS defendants partial summary judgment as to the third prong of the government contractor immunity defense. Further, the court STRIKES the declarations of A.B. McDonald previously filed by MDC in this action because Mr. McDonald lacked sufficient personal knowledge to make those declarations. However, the court does not find it necessary to reconsider the partial summary judgment granted in favor of MDC and declines to sanction MDC or its counsel. The court also finds that there is no evidence in the record supporting plaintiff's theory of a "pure" manufacturing defect or supporting any other claim for relief precluding a grant of summary judgment as to this action as a whole under *Boyle*. Defendants' motions for summary judgment are therefore GRANTED.

### BACKGROUND [1]

As part of their initial opposition to defendants' summary judgment motions, plaintiffs

---

1. The facts that gave rise to this action and that provide the background to defendants' motions

offered a drawing with handwritten comments by GD engineer Jerry Kennedy dated February 11, 1980. Spriggs Dec. Ex. 6; Deposition of Jerry Kennedy ("Kennedy Dep.") Ex. 2 ("the Kennedy Drawing"). The document is the first page of a set of structural calculations some twenty pages long prepared by Kennedy regarding the effects of mounting a seat data recorder ("SDR") on the left "fairing" (side cover panel) of an "ACES–II" ejection seat of the type used in plaintiffs' decedent's airplane. Kennedy Dep. Ex. 2. The handwritten comment on the Kennedy drawing states:

> The data recorder is attached to the drogue chute shroud line cover fairing on the side of the ejection seat. The data recorder weighs 3.2 lbs. McDonnell Douglas, subcontractor on the seat, has questioned whether the data recorder may cause the fairing to buckle and tangle in the chute shroud lines. The job is being coordinated through George Larson in the design group.

*Id.* at 1.

Because there is no evidence that the Kennedy Drawing was ever sent to the Air Force, plaintiffs offered the document as evidence that defendants had more knowledge than the government of potential parachute entanglement dangers. Therefore, they argued that summary judgment should be denied on the failure to warn prong of *Boyle.*

In response, defendants relied on a declaration by Robert Billings, who worked on the ACES II seat as an employee of the Air Force Life Support System Program Office ("SPO") between 1974 and mid–1982. Declaration of Robert Billings in Support of the Reply of McDonnell–Douglas Corp. ("Billings Dec.") ¶ 3. In this declaration, Billings stated that MDC had, in the course of a study on the impact of the seat data recorder on the F–16 ACES–II ejection seat, advised the Air Force that "the original installation as proposed by General Dynamics Corporation may not withstand a 40–G deceleration drogue load without buckling the fairing on the side of the seat." Billings Dec. ¶ 5. Billings also

stated that "Douglas believed that if the fairing buckled the personnel parachute suspension lines could become trapped within the personnel parachute housing." *Id.*

The court found that Billings' declaration provided evidence that the Air Force may have been informed that seat fairing buckling could cause parachute entanglement. However, the court concluded that it was not sufficiently clear based on Billings' declaration when or how defendants had informed the Air Force of the danger of parachute entanglement to grant summary judgment on the third prong of the government contractor immunity defense. For that reason, the court granted plaintiffs leave to conduct additional discovery on the third, or warning, prong of *Boyle.*

The court must now determine whether defendants are entitled to summary judgment that they warned the Air Force of any dangers with respect to the ACES–II ejection seat of which they had more knowledge than the Air Force.

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial … since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present significant probative evidence supporting the claim); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

for summary judgment have already been discussed at length in the court's Memorandum and Order of January 7, 1992. The court accordingly does not recite the full background here, but refers to it to the extent it is relevant to the disposition of the remaining part of the motions.

The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## II. *The Government Contractor Immunity Defense under Boyle*

Under *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518–19, liability for design defects in military equipment cannot be imposed pursuant to state law when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. While the federal contractor immunity defense relieves suppliers of military equipment of liability for design defects, it does not relieve them of liability for pure manufacturing defects. *McKay v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *McGonigal v. Gearhart Industries, Inc.*, 851 F.2d 774, 777 (5th Cir. 1988).

The contractor's duty to warn under the third prong of *Boyle* extends only to those dangers in the use of the equipment which are unknown to the government. *Stout v. Borg–Warner Corp.*, 933 F.2d 331, 336, *cert. denied*, —— U.S. ——, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991). Further, the contractor is held to an actual knowledge standard whereby the contractor has no duty to warn the government of hazards of which it is not actually aware. *McKay*, 704 F.2d at 451; *In re Aircraft Crash Litigation*, 752 F.Supp. 1326, 1364 (S.D.Ohio 1990), *aff'd sub nom. Darling v. The Boeing Co.*, 935 F.2d 269 (6th Cir.1991) ("Under *Boyle*, a contractor has no duty to warn of dangers in the use of its equipment of which it has no actual knowledge."); *see also Boyle*, 487 U.S. at 513, 108 S.Ct. at 2519 ("it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects.").

## DISCUSSION

The court granted plaintiffs leave to take the depositions of Messrs. Spriggs, Larson and Kennedy of GD, Mr. McDonald of MDC and Mr. Billings of the Air Force in order for plaintiff to substantiate their claim that defendants failed to warn the Air Force that seat fairing buckling could cause parachute entanglement or entrapment. In light of those depositions, the court now finds that defendants have met their summary judgment burden as to the third prong of the *Boyle* defense. The deposition testimony submitted by the parties shows that defendants warned the Air Force of all dangers associated with buckling and parachute entanglement or entrapment which were known to defendants but not to the Air Force.

Plaintiffs rely on several different theories to raise a genuine issue of material fact as to the duty to warn. For the reasons explained below, all of these theories fail. Plaintiffs also argue that the fact that the fairing on plaintiffs' decedents' seat buckled even though the Air Force did not want it to buckle raises the issue of whether there was a manufacturing defect in the fairing, to which the military contractor defense would not apply. As explained below, this last-minute theory also fails.

## I. *Duty to Warn under Boyle*

Plaintiffs do not dispute that defendants warned the Air Force of a risk that *personnel* parachute lines might be entrapped or entangled by fairing buckling caused by the SDR. However, they contend that the depositions raise issues of material fact regarding defendants' failure to warn of other alleged dangers, first and foremost the danger that the SDR could cause the fairing to buckle and entangle the *drogue* chute lines.[2]

---

2. The drogue parachute system is a separate and distinct system from the personnel parachute system. It includes two smaller parachutes which are stored in the ACES–II seat separately from the personnel parachute and which normally deploy before the personnel parachute. *See* Deposition of Robert Billings ("Billings Dep.") at 144–49.

The deposition testimony submitted by the parties shows the following. First, MDC warned the Air Force, by means of a study dated March 12, 1980 ("MDC Study"), that GD's original design for mounting the SDR on the left side fairing of the ACES–II ejection seat could cause the fairing to buckle and entrap the personnel parachute suspension lines stored beneath the fairing. MDC concluded that this might occur when the ACES–II seat was subjected to the decelerative loads generated during a high-speed ejection with the drogue chute fully deployed. *See* Billings Dep. at 24–28; 135–42; 150–54; Declaration of Percy Anderson filed November 20, 1992 ("Anderson Dec.") Ex. 3 (MDC Study, dated March 12, 1980).

Second, GD redesigned and strengthened the SDR mounting in accordance with GD's understanding of MDC's concern that the installation should be made strong enough to withstand a 40–G deceleration load at 600 knots caused by the drogue chute fully deployed. Deposition of Gene Spriggs ("Spriggs Dep.") at 77–78; 123–24. Although GD's engineer in charge of designing the SDR modification did not employ the specific design modification suggested to the Air Force in the MDC Study, which he had never seen, he designed the GD modification to withstand a 40–G deceleration load caused by a fully deployed drogue chute. Deposition of George Larson ("Larson Dep.") at 26–36. Moreover, the GD stress engineer who analyzed the modification concluded that it could withstand a drogue chute deceleration load of 41–G's. Kennedy Dep. at 69–70; 129.

Third, despite plaintiffs' several theories, the depositions have produced absolutely no evidence that either GD or MDC ever had actual knowledge of any danger unknown to the Air Force with respect to the ACES–II ejection system of which it failed to warn the Air Force. The only possible suggestion of such knowledge remains the handwritten comment on the first page of the Kennedy Drawing, which appears to indicate that there was concern among defendants that fairing buckling might cause tangling of the drogue chute lines. However, as explained below, the deposition testimony now before the court conclusively lays to rest this suggestion.

### A. Statement in the Kennedy Drawing

Despite the depositions they recently completed, plaintiffs provide no new evidence to support their theory that defendants knew but failed to warn the Air Force that mounting the SDR on the fairing might cause buckling which would entangle the *drogue* chute lines. Lacking any testimony to support this theory, plaintiffs instead point to Mr. Kennedy's lack of recollection at his deposition regarding the circumstances surrounding his preparation of the Kennedy Drawing almost thirteen years ago. With regard to the handwritten comment on the Kennedy Drawing, Mr. Kennedy testified at his deposition that "I don't remember writing it down, but I believed it to be correct at the time when I wrote it." Kennedy Dep. at 95. Plaintiffs urge that this handwritten statement, which the court has previously ruled to be inadmissible hearsay as to MDC, be admitted under Federal Rule of Evidence 803(5) (Recorded Recollection).

However, with regard to the crucial part of his statement in the Kennedy Drawing that "[t]he data recorder is attached to the drogue chute shroud line cover fairing on the side of the ejection seat," Mr. Kennedy has testified that he was mistaken when he wrote that the fairing covered the drogue chute lines. Kennedy Dep. at 104–06. He testified that he did not then have, nor does he now have, personal knowledge of the design of the ACES–II seat. *Id.* at 44; 76–77; 95; 105–06. Specifically, Mr. Kennedy has testified that, in fact, he had no understanding of what a drogue chute is when he prepared the Kennedy Drawing or at present. *Id.* at 106. Mr. Kennedy reached the conclusion that he was mistaken by reading the Billings Deposition. *Id.* at 104–05. As Mr. Kennedy put it, "I am no expert in the construction of this seat ... [Billings who] has worked with it continuously for years could locate the chutes and I couldn't. I put the wrong name on that part." *Id.* at 105.

Indeed, the evidence in the record shows that the chute lines stored under the fairing on which the SDR is mounted are in fact the personnel chute lines and not the drogue

chute lines. Billings Dep. at 143–49; Spriggs Dep. at 108–111. Plaintiffs do not dispute this. It is accordingly clear that Kennedy, who is a stress engineer, lacked knowledge with respect to the location of the drogue chute lines at the time he wrote the comment on the Kennedy Drawing on which plaintiffs now rely.

Rule 803(5) requires that a declarant have had knowledge of the matter recorded when he made the record in order for the record to be admissible as recorded recollection. Regardless of what he may have then "believed" as to the location of the drogue lines, Kennedy did not have the requisite knowledge when he wrote the statement on the Kennedy Drawing. That statement accordingly remains inadmissible hearsay for the purpose of showing that MDC was concerned that drogue chute lines might become entangled due to fairing buckling.

Moreover, even if Kennedy's statement were somehow admissible, the court finds that no reasonable jury could conclude based on the statement—given the testimony of Kennedy and the other witnesses that the statement is incorrect—that defendants were actually concerned about drogue line entanglement due to fairing buckling. The evidence shows that defendants were concerned about personnel chute line entanglement or entrapment, that they warned the Air Force, and that corrective steps were taken. The Kennedy Drawing remains what it was when the court issued its January 7, 1992 Order granting plaintiffs leave for further discovery—a mere suggestion that defendants had knowledge of dangers which they did not disclose to the Air Force. However, that suggestion is now belied by the abundant evidence that defendants' concern with respect to parachute line entanglement or entrapment caused by buckling of the fairing due to installation of the SDR involved the personnel, not the drogue, parachute.

### B. Structure vs. Non–Structure

Plaintiffs also now contend that the Air Force was not adequately advised that the fairing was a "non-structural" part of the ACES–II seat and that the modified fairing designed by GD was not "structurally" adequate. This wholly new argument is based on nothing more than a few lines of Mr. Larson's deposition testimony taken out of context and a reference in the MDC Study. It is nothing more than semantical sparring.

At one point in his deposition Mr. Larson made a distinction between the "strength of the seat" and "the strength of the fairing." He testified that "the strength of the seat had nothing to do with the strength of the fairing" (Larson Dep. at 56) and that the "strength of the seat was entirely the Douglas' responsibility, we [GD] never got involved in the strength of the seat." Id. The MDC Study refers to "seat structural analysis." Anderson Dec. Ex. 3 at 2.

The court cannot discern how these statements or any other testimony in the record shows that defendants knew or even suspected that the GD modification posed a risk of which they did not warn the Air Force. Although they do not spell their theory out, plaintiffs apparently contend that the use of the "structural" language in the MDC Study somehow misled the Air Force into believing that the fairing is a "structural" part of the seat body rather than just a cover. Larson's testimony is apparently offered to show that GD did no testing of the seat structure, and that this somehow misled the Air Force regarding some danger.

This whole theory is both incoherent and misleading. Plaintiffs focus on the semantics of "structure" and "non-structure" and ignore the substance of the MDC Study. Although the MDC Study refers to "seat structure", it is primarily a study about the ability of the *fairing*, not the seat, to withstand deceleration loads with the SDR mounted on it. There is absolutely no evidence in the record that the Air Force was unaware that the fairing was merely a cover and not a part of the overall seat structure.

Even if this were so, it would be completely immaterial for purposes of the third prong of *Boyle* as long as defendants had no actual knowledge that the GD modification to the fairing posed a risk. The same is true of Larson's distinction between "seat strength" and "fairing strength". There is nothing in the record that indicates that Larson or anyone else employed by defendants knew of a

danger posed by failure to test "seat strength" as opposed to "fairing strength". Indeed, plaintiffs whole basis for this suit involves fairing buckling, not a deficiency in the strength of the overall seat.

### C. *Windblast*

Based on a new declaration by their expert, Edward B. Flora,[3] plaintiffs also argue that defendants knew that "windblast" could buckle the fairing with the SDR mounted on it and that neither defendant fully analyzed this risk or informed the Air Force of it. However, this is only a theory and no evidence has been offered to support it.

The Flora Declaration does nothing more than present Mr. Flora's theory that windblast caused the fairing buckling. It does not provide any scientific analysis or data to support this view. More significantly, plaintiffs provide absolutely no evidence that defendants at any relevant time held a similar view regarding windblast risks.

Even assuming expert Flora's opinion is correct, and windblast could have been the cause of the fairing buckling in this case, and even if defendants reasonably should have discovered this danger, the evidence does not show that defendants actually knew of any danger due to windblast.[4] The standard which governs a contractor's duty to warn under the third prong of *Boyle* is actual knowledge, not a negligence or reasonableness standard. *See McKay,* 704 F.2d at 451; *In re Aircraft Crash Litigation,* 752 F.Supp. at 1364. Even if Mr. Flora's declaration is viewed in the light most favorable to plaintiffs, at most it raises the inference that defendants reasonably *should have* known that a windblast danger existed. That would not be sufficient to rebut the ample deposition testimony showing that defendants did not in fact *actually* know of such a danger.

Mr. Larson of GD testified that he did not recall considering windblast, but that he likely dismissed it because the load would have been minimal. Larson Dep. at 36–38. Mr. Kennedy of GD did not consider windblast at all. Kennedy Dep. at 93. Mr. Spriggs of GD testified that he understood that "Douglas considered the wind blast angle in that the frontal area offered by this added package [the SDR] would offer very little resistance and would not affect seat stability. That verbally came from Douglas." Spriggs Dep. at 127. However, he testified that GD did no windblast analysis itself because "Douglas was chartered to do that investigation." *Id.* at 128. Spriggs also testified that, throughout his involvement with the modified SDR installation on the ACES–II, he was never concerned that windblast could have an effect. *Id.* at 147. Mr. McDonald of MDC testified that he did not know if wind blast was considered as a factor in the MDC Study of mounting the SDR on the ACES–II seat because he was not assigned to the study. McDonald Dep. at 46. However, Mr. Billings of the Air Force testified that all forces—including aerodynamic forces—were considered by MDC and the Air Force, and that only a full drogue load was considered to pose a risk. Billings Dep. at 171.

Plaintiffs suggest that GD's lack of windblast testing coupled with Mr. McDonald's testimony that he did not know if MDC conducted windblast testing somehow amount to evidence that defendants knew of, and failed to disclose, a risk that windblast could cause the fairing to buckle. To the contrary, the foregoing deposition testimony demonstrates that the GD engineers either did not consider windblast or were not concerned that it posed a risk. And, while Mr. McDonald of MDC did not know whether windblast had been considered by MDC, Mr. Billings of the Air Force specifically testified that aerodynamic forces were considered by MDC *and* the Air Force and found to present no danger. Therefore, there is no evidence to support plaintiffs' theory that defendants failed to warn of a windblast danger known to them but not to the Air Force.

### D. *GD Design vs. MDC Design*

Plaintiffs also contend that GD's use of its own design to modify the SDR mounting on

---

**3.** *See* Declaration of Edward B. Flora dated November 16, 1992 ¶¶ 5–6.

**4.** MDC has objected and moved to strike portions of the Flora Declaration. Because the court rules that there is no evidence that defendants knew of a windblast danger, the court need not consider MDC's motion to strike.

the fairing was a danger known to defendants of which they failed to warn the Air Force. Plaintiffs argue that the Air Force believed the fairing was "beefed up" according to the MDC design submitted to the Air Force with the MDC Study, and that GD's use of its own design constituted a danger of which the Air Force was not warned.

This theory is spurious for two reasons. It is spurious as a matter of law because GD's use of its own design relates at most to the second (conformity with applicable specifications) prong of *Boyle*, not to the duty to warn prong. In fact, plaintiffs raised the identical issue as an argument against partial summary judgment on the second prong. The court found that the MDC design did not create a design requirement, but merely suggested a possible revision to the seat data recorder installation. *See* Memorandum and Order dated January 7, 1992 at 17.

Secondly, Mr. Billings' testimony shows that the Air Force was perfectly well aware that the modification or "beefing up" of the fairing was not done precisely according to the MDC design. Mr. Billings testified that "the change was not exactly like [the MDC design] but it covered the intent of the change [proposed by the MDC design]." Billings Dep. at 139. As already explained above, the intent of the change proposed by MDC was that the fairing with the SDR attachment withstand buckling under deceleration loads of 40 G's caused by a fully-inflated drogue chute. The evidence in the record shows that GD's engineers designed the fairing modifications to withstand buckling under such conditions. Therefore, the fact that GD did not follow the precise design suggested by MDC does not suggest that there was any risk created in the use of the ACES-II, let alone that defendants knew of any such risk and that the Air Force did not.

### E. *Credibility or Lack of Personal Knowledge of Witnesses*

Plaintiffs assert that defendants lack credibility because the declarations of their employees vary from the deposition testimony of those same employees. They argue that this variance raises issues of material fact. It is clear from Mr. McDonald's deposition that his personal knowledge of the MDC Study is extremely limited because he was not directly involved in the Study. McDonald Dep. 24–27. Mr. McDonald's relevant personal knowledge was that he looked at the original GD drawings of the proposed SDR installation and had some conversations with members of MDC's design group in 1980 regarding the original SDR installation on the ACES–II. McDonald Dep. at 32–37; 47–48. However, Mr. McDonald apparently had little or no personal knowledge of the actual preparation of the MDC Study or of GD's modification of the fairing. *Id.* at 24–27; 40–41. Moreover, Mr. McDonald testified that he had never seen a number of the documents attached to his declarations, including the MDC Study, until this litigation began. *Id.* 24; 27; 29; 31; 34; 48; 50; 56–57. Certainly, this renders his declarations misleading and such declarations should not be submitted to the court. The court accordingly strikes the three McDonald declarations submitted by MDC because the declarant lacks personal knowledge as to the matters therein.

However, the court has reviewed its previous ruling granting MDC partial summary judgment as to the first two prongs of *Boyle* and finds that the striking of the McDonald declarations has no material effect on that ruling. In the January 7, 1992 ruling, the court relied primarily on the Joint Statement of Material Facts stipulated to by plaintiffs and MDC and not at all on Mr. McDonald's declarations of September 30, 1991 and October 31, 1991. Moreover, all of the facts regarding the MDC Study and GD's modification recited in Mr. McDonald's declarations are confirmed in the record by the depositions and declarations of Mr. Billings of the Air Force and of GD's engineers. As this Order shows, the court does not rely on the McDonald declaration of June 24, 1992 in ruling on the pending motion as to the third prong of *Boyle*. Therefore, the court does not find it necessary to reconsider its previous partial summary judgment ruling in favor of MDC or to strike the government contractor immunity defense as to MDC.

Plaintiffs also suggest, but do not move, that the court sanction MDC and its counsel for submitting the McDonald declarations.

In view of the fact that most, if not all, of the facts stated in the McDonald declarations are supported by other evidence properly in the record (e.g., the Billings deposition, the MDC Study, the Joint Statement of Material Facts of MDC and Plaintiffs), the court declines to impose sanctions. However, this should not be viewed as an invitation to counsel to submit such inadmissible declarations in the future. Counsel for MDC is admonished to do a more thorough investigation of declarants' personal knowledge before submitting future declarations to this or other courts.

Apart from the lack of personal knowledge admitted by Mr. McDonald in his deposition, plaintiffs do not articulate how or why the court should question the credibility of the witnesses whose depositions they took. Moreover, even if there appeared some grounds to do so, it is well established that the court's function, ruling on summary judgment, is not to make credibility determinations. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. A party opposing summary judgment "must affirmatively show that a material issue of fact remains in dispute and may not simply rest on the hope of discrediting movant's evidence at trial." *Frederick S. Wyle P.C. v. Texaco, Inc.,* 764 F.2d 604, 608 (9th Cir.1989). Plaintiffs have failed to bring forth evidence showing that any issue of material fact remains in dispute regarding defendants' duty to warn under the third prong of *Boyle.* Allegations about credibility cannot replace such a showing.

## II. *Defective Manufacture and Other Claims*

The Complaint alleges four claims for relief: design defect; defective manufacture, assembly, installation; negligence in manufacture; and misrepresentation or failure to warn. The *Boyle* defense clearly bars the design defect claim. However, plaintiffs argue that summary judgment should not be granted on the entire action because the *Boyle* defense applies only to design defects and the deposition testimony raises a genuine issue of material fact that buckling occurred due to a "pure" manufacturing defect which is not covered by the defense. When asked at oral argument if any claims other than the design defect claim remained which precluded summary judgment, plaintiffs cited only their manufacturing defect claim. However, for the following reasons, the court finds that no genuine issue of material fact remains with respect to *any* of plaintiffs' claims and that defendants are entitled to judgment on all claims as a matter of law.

### A. *Defective Manufacture and Negligence Claims*

Plaintiffs correctly contend that *Boyle* does not bar claims against government contractors based on "pure" manufacturing defects, or flaws in products attributable to shoddy workmanship or assembly rather than to a defective design. *See Mitchell v. Lone Star Ammunition Co.,* 913 F.2d 242, 248 (5th Cir.1990) ("[I]f a defect is the result of shoddy contractor workmanship, no federal interest justifies an immunity from liability."); *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1317 (11th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990) ("If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest."). However, plaintiffs do not raise a genuine issue of material fact with respect to manufacturing defects beyond the purview of *Boyle.*

The sole evidence that plaintiffs offer to support their manufacturing defect theory is that the Air Force "did not want the buckling to occur," Billings Dep. at 51, and that the fairing buckled anyhow. This evidence fails to raise a genuine issue of manufacturing defect as a matter of law. The distinction between manufacturing defects not governed by *Boyle* and design defects which are governed by *Boyle* was described by Justice Powell as one "between an unintended configuration [manufacturing defect] and an intended configuration that may produce unintended and unwanted results [design defect]." *Harduvel,* 878 F.2d at 1317. Plaintiffs' evidence that the Air Force "did not want the buckling to occur" but that it occurred anyhow merely shows that a *result* that was unintended and unwanted occurred.

**596**

It does not show, or even suggest, that the product *configuration* involved was "unintended".

The material issue is not whether there was an unwanted result, but "whether the Government may be said to have 'authorized' the defective condition, in spite of the possible results." *Mitchell,* 913 F.2d at 248. If the government authorizes a defective condition by means of specifications complied with by the contractor, the defect is one of design; if, on the other hand, a defective condition results from a contractor's failure to comply with government design specifications, then the defect is one of manufacture. *Id.* "In either event, the defect may produce unintended and unwanted results. . . ." *Id.*

As the court found in its January 7, 1992 Order, the Air Force issued detailed design specifications for the mounting of the SDR on the fairing and defendants complied with those specifications. Plaintiffs have produced absolutely no evidence suggesting that defendants' assembly or manufacture of the particular ACES–II seat in Capt. Sundstrom's airplane was defective in the sense that it failed to comply with the design authorized by the Air Force. Indeed, plaintiffs' whole theory of this case has been that the design itself—mounting the SDR on the fairing—caused the fairing to buckle. The fact that the Air Force did not "want" the fairing to buckle is irrelevant to whether defendants failed to comply with authorized design specifications. *See also Kleeman v. McDonnell–Douglas Corp.,* 890 F.2d 698, 703 (4th Cir. 1989) ("Nonconformance to precise specifications must mean more than that the design does not work in compliance with some 'general admonition against an unwanted condition.'") (quoting *Harduvel,* 878 F.2d at 1319 n. 3).

Therefore, the court finds that defendants are entitled to summary judgment on plaintiffs' defective manufacturing claim (Complaint ¶¶ 16–19). Because plaintiffs' negligence claim (Complaint ¶¶ 20–25) merely realleges and duplicates their defective manufacturing claim and because plaintiffs have proffered no further evidence to support either claim, the court finds that summary

judgment is also proper as to the negligence claim.

**B.** *Misrepresentation or Failure to Warn Claim*

██ Plaintiffs have not argued that their failure to warn claim is not barred by *Boyle.* However, for the sake of completeness, the court will address that claim as well. The complaint alleges that Capt. Sundstrom and the Air Force relied on the safety of the ACES–II system and that steps would have been taken to make it safer had defendants warned of its dangers. *See* Complaint at ¶¶ 31–33. The court finds that this failure to warn claim is also barred by the government contractor immunity defense.

By granting partial summary judgment on the third prong of *Boyle,* the court finds that the Air Force was aware of any possible dangers in the ACES–II. Therefore, plaintiffs' claim cannot be based on a failure to warn the Air Force. However, plaintiffs' claim might arguably still be based on allegations that Capt. Sundstrom, apart from the Air Force, was not aware that the ACES–II was dangerous. Under controlling Ninth Circuit authority and *Boyle,* that more limited claim is also barred when defendants have established government contractor immunity.

The Ninth Circuit in *McKay* held that the government contractor immunity defense applied to the defendant contractor. 704 F.2d at 451. However, in addition to their design defect theory, plaintiffs in *McKay* relied on Section 389 of the Restatement (Second) of Torts. Section 389 concerns a supplier's liability to persons ignorant of dangers from a product supplied to a party aware of the product's danger, where the supplier knows that the product is unlikely to be made reasonably safe before it is used by the "ignorant" persons. 704 F.2d at 455.

The Ninth Circuit declined to allow the plaintiffs (widows of Navy pilots) to proceed against a military contractor defendant on this theory because "Section 389 . . . presupposes . . . 'persons who are ignorant of the dangerous character of the chattel'" would not use a product if they knew it was dangerous. *Id.* However, the court noted that such an assumption could not be made in the

case of military personnel: "Naval pilots are required to fly as ordered." *Id.*

Plaintiffs' failure to warn claim is analogous to the Section 389 theory rejected by the Ninth Circuit in *McKay.* In this action, because the Air Force was warned of all known dangers in the ACES–II system, plaintiffs' claim would have to rest on the allegation that Capt. Sundstrom himself was not warned. However, such a claim is barred under *McKay's* analysis because Capt. Sundstrom, as a military officer who must follow orders, could not have refused to fly even if defendants had warned him that the design of the ACES–II seat in his airplane was somehow unsafe. Because the Air Force was already apprised of all known dangers and opted to proceed with the mounting of the SDR, a warning from defendants could not have prevented any risk to plaintiffs' decedent.

Moreover, entertaining a failure to warn claim in this action would present the kind of interference with discretionary government acts that *McKay* and *Boyle* intended to prevent. As the Supreme Court stated in *Boyle,*

[T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function … It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. … [P]ermitting "second-guessing" of these judgments, *see United States v. Varig,* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984), through state tort suits against contractors would produce the same effect sought to be avoided by the [Federal Tort Claims Act] exemption. The financial burden of judgments against the contractors would ultimately be passed along, substantially, if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the government ordered designs.

*Boyle,* 487 U.S. at 511–12, 108 S.Ct. at 2518. In this case, the Air Force specified and approved the design for the mounting of the SDR on the fairing of the ACES–II seat. The Air Force thereby made a judgment, rightly or wrongly, that the design was safe. Therefore, the only effect of imposing tort liability on defendants for failing to warn would be to second-guess the government's judgment and to vitiate the intended effect of the *Boyle* defense.

*CONCLUSION*

For the foregoing reasons:

1. The court GRANTS defendants partial summary judgment as to the third prong of the *Boyle* defense.

2. The court STRIKES the declarations of A.B. McDonald filed by MDC on September 30, 1991, October 31, 1991 and June 24, 1992.

3. The court FINDS that no genuine issues of material fact remain as to any of the claims for relief in the complaint and that, under *Boyle,* defendants are entitled to judgment as a matter of law.

Therefore, defendants' motions for summary judgment are GRANTED and this action is DISMISSED in its entirety.

IT IS SO ORDERED.