Vincent QUILES, Plaintiff,

v.

SIKORSKY AIRCRAFT, A Division of United Technologies Corporation, and United Technologies Corporation, Defendants.

No. Civ 98–11208–DPW.

United States District Court, D. Massachusetts.

Sept. 8, 1999.

---

156

Guard helicopter experienced a hard landing as a result of a crack in a part called a tip cap. The accident caused back injuries and related problems to Quiles, at the time a flight mechanic for the United States Coast Guard. Quiles has brought claims against the defendant companies, which designed and built the helicopter, for design and manufacturing defects on negligence and strict liability theories, as well as for breach of warranties, failure to warn, and failure to recall. Defendants have moved for summary judgment on all counts based on the government contractor defense, which shields contractors from liability in cases in which they followed government specifications. Plaintiff contends primarily that the defendants did not follow the government's specifications in building the allegedly defective helicopter and moves to strike the defendants' affidavits. I will grant in part and deny in part the plaintiff's motion to strike, and I will grant the defendant's motion for summary judgment.

Jeffrey P. Petrucelly, Petrucelly & Nadler, Boston, MA, for Vincent Quiles, plaintiff.

Raymond L. Mariani, New York City, Richard P. Campbell, Campbell, Campbell & Edwards, Boston, MA, Amy C. Cashore, Campbell Campbell & Edwards, Boston, MA, for Sikorsky Aircraft, A Division of United Technologies Corporation, defendant.

Richard P. Campbell, Amy C. Cashore, Campbell Campbell & Edwards, Boston, MA, for United Technologies Corporation, defendant.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff Vincent Quiles brought this action against Sikorsky Aircraft, a division of United Technologies Corporation, and against United Technologies Corporation, asserting claims stemming from a helicopter accident which occurred on April 17, 1995. On that day, an HH–60J Coast

## I. BACKGROUND

### A. The Parties

Plaintiff Vincent Quiles, currently a resident of Pennsylvania and formerly a Massachusetts resident, was a flight mechanic for the United States Coast Guard stationed at Otis Air Force Base in Massachusetts at the time of the incident in question. (Compl.¶¶ 1, 2.) Defendant Sikorsky Aircraft (hereinafter "Sikorsky") was an unincorporated operating division of United Technologies Corporation ("UTC") and is now a business entity organized under Delaware law with a place of business in Connecticut. (Answer ¶ 3.) Sikorsky designs, manufactures, and sells helicopters, including the Model HH–60J. (Id.) Defendant UTC is a Delaware corporation with a place of business in Connecticut. (Id. ¶ 4.)

### B. The Accident

On April 17, 1995, a U.S. Coast Guard HH–60J helicopter was forced to "crash

land," or, alternatively stated, "sustained a hard landing," on a beach near Plymouth, Massachusetts. (Sikorsky Aircraft's Mem. of Law in Supp. of Its Mot. for Summary Judgment ("Defs.' Mem.") at 1; Pl.'s Mem. of Law in Supp. of His Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Mem.") at 3.) The helicopter was forced to land when a "tip cap," a part at the end of the main rotor blade, fractured and detached, damaging the blade. (*Id.*) The two crew members who were piloting the helicopter apparently were unharmed and have not filed suit. (Defs.' Mem. at 1.) Quiles, however, asserts that he has experienced severe back pain, as well as stress and related difficulties as a result of the accident. (Compl.¶¶ 7, 17.)

## C. The Lawsuit

Quiles brought suit in Massachusetts Superior Court, alleging negligence in design, manufacture, and failure to warn (Count I), strict product liability resulting from defective design and manufacture and inadequate warning (Count II), breach of implied and express warranties (Count III), failure to warn (Count IV), and failure to recall a defective product (Count V). (Compl.¶¶ 18–32.) Defendant removed the action to this court and now moves for summary judgment based on the government contractor defense approved by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Plaintiff argues that the government contractor defense does not apply and moves to strike all or parts of the affidavits submitted by defendant. Before reaching the legal issues, I will consider the development of the helicopter and the part at issue as well as the governing specifications and whether the tip cap in this case met those specifications. These factual issues form the crux of my determination of whether the government contractor defense applies in this case.

## D. Design and Approval of the Helicopters at Issue

The helicopter involved in this case was an HH–60J Coast Guard helicopter bearing serial number 163816, but the tip cap which fractured had originally been manufactured by Sikorsky for a UH–60A army helicopter bearing serial number 88–26085. (Sikorsky Aircraft's Statement of Uncontested Facts Pursuant to Rule 56.1 ¶¶ 6, 9.) The Army had removed the tip cap from service because it was cracked, and the Coast Guard used it after repair despite apparent knowledge of its maintenance history. (Defs.' Mem. at 7; Defs.' Doc. App., Exs. 18, 19.) Defendants have provided an exhaustive account, largely undisputed by the plaintiff, of the process which led to the design of the Army and Coast Guard helicopters at issue.

The Army opened up a bidding process for a specific type of helicopter in the 1970s. As part of this process, UTC submitted a proposal which was extensively reviewed and revised by the Army. (Defs.' Mem. at 4.) After several levels of review, the Army chose UTC to build the Blackhawk or UH–60A helicopter, but required UTC to go through additional levels of review and testing before the helicopters were built and accepted. (*Id.* at 4–5.) The government specified not only the design of the Blackhawk, but also the precise method by which it was to be manufactured. (*Id.* at 5.) Defendants assert that the Blackhawk helicopter from which the tip cap at issue here came was built to these specifications. (*Id.*)

UTC followed similar processes in designing similar helicopters for other services. Specifically, the Coast Guard decided to model its HH–60J or Jayhawk substantially after the SH–60B or Seahawk, a Blackhawk derivative developed by the Navy. (*Id.*) While the design of the rotor blade for the Jayhawk is very similar to that for the Blackhawk, the two helicopters have different uses which in turn require different replacement times for various parts, including tip caps. The Coast Guard requires that a tip cap be replaced after 6700 hours as opposed to

the 13,000 hours specified by the Army. (*Id.* at 6.)

The military became aware of many instances of tip caps cracking long before the specified replacement time in Blackhawks and related helicopters at least as early as 1988. (Defs.' Mem. at 7; Brisbois Aff. ¶¶ 7–10; Eagar Aff., Ex. H.) The military informed the defendants about the problem, and the parties discussed potential solutions, eventually deciding to manufacture the tap cap out of a composite material rather than aluminum. (Defs.' Mem. at 7; Brisbois Aff. ¶¶ 7–10.) The tip cap in question in this case was manufactured according to the original design, rather than the later composite design. (Defs.' Mem. at 7.) Defendants contend that they did not know of any information regarding problems with tip caps that they did not communicate to the government. (Defs.' Mem. at 7; Brisbois Aff. ¶ 11; Crawford Aff. ¶ 10; Potts Aff. ¶ 19.) The plaintiff has provided no evidence to the contrary, submitting instead a report filed by the Army about the problem and one submitted to the Army by the defendants, suggesting that the Army had at least as much knowledge about this problem as the defendants did, and that the defendants shared all relevant information they possessed. (Eagar Aff., Ex. H.)

### E. Conformance to Government Specifications

Plaintiff asserts that the tip cap and helicopter at issue in this case did not conform to the specifications approved by the government. Plaintiff, primarily through his expert, Thomas Eagar, contends that the thickness of the fairing of the tip cap at issue was 0.060 inches, while the government required a thickness of 0.063 inches. (Pl.'s Mem. at 4; Eagar Aff. ¶¶ 17, 18.) Eagar contends that a five percent deficiency in the thickness of the tip cap, which he asserts was the case here, would result in a significantly faster rate of crack growth, which in turn could make detection of the crack in time to avoid a problem less likely. (*Id.* ¶ 18.)

Eagar based his conclusions primarily upon a Materials Engineering Laboratory Report, which he identified as coming from the defendants, but which defendants state was in fact prepared by the government. (*Id.* ¶ 17; Sikorsky Aircraft's Reply Mem. of Law in Further Supp. of Its Mot. for Summary Judgment ("Defs.' Reply Mem.") at 2; Potts Supplemental Aff., attached to Defs.' Reply Mem., ¶ 4.) The report states in relevant part, "The fairing material averaged 0.060 inch thickness adjacent to the countersunk fastener area. The drawing requirements call for a nominal 0.063 inch thickness, however, stretch forming of the fairing could account for the reduction to the measured thickness." (Eagar Aff., Ex. D at 3.) Plaintiff also includes a report from an earlier incident of tip cap cracking, in which UTC itself had written, "Fairing wall thickness in several areas adjacent to the crack ranged between .059–.061 inch. The drawing calls for a .063 inch nominal stock thickness requirement. However, stretch forming and sanding generally reduce this, typically to the thickness measured." (Eagar Aff., Ex. H at 3.)

Defendants contend that the 0.063 inch requirement is for the thickness of the aluminum stock before it is formed and fashioned into a tip cap. They assert that the minimum thickness required for the tip cap after it is formed is 0.052 inches, which the part in question more than met. (Defs.' Reply Mem. at 5–6.) They base this assertion upon an affidavit and a note to a government design drawing which they assert sets out the required proportions. (Potts Supplemental Aff. ¶¶ 5, 6; Design Drawing 70150–09107, Note 7, Ex. 23 to Defs.' Doc.App.)

The design drawing itself is difficult for an untrained observer to interpret. Note 7 states, "Minimum sheet thickness prior to stretch forming .059. Minimum thickness after stretch forming and prior to chemical etch .052." (Design Drawing 70150–09107, Ex. 23 to Defs.' Doc.App.) The note does not specify which part of the

tip cap it refers to. The 0.063 inch figure shows up at least twice in the drawing, once (near the label "Sect C–C") clearly in reference to unformed stock (as it says ".063 stock"), but the other time (near the label "Sect B–B") next to what may appear to be a finished part and labeled ".063 ref". The defendants contended in argument that the plan specifies the required thickness of the aluminum used in the tip cap at three different stages: 0.063 for unformed stock, 0.059 after some processing but before stretch forming, and 0.052 after stretch forming and prior to chemical etching. The plaintiff's expert, Eagar, in an affidavit, candidly states that, based on his review of the relevant documents, he cannot confirm or deny that Note 7 refers to the thickness of the entire tip cap or that it applies to the part that cracked in this case. (Eagar Third Aff. ¶ 8.) However, Len Meyer, a design engineer for Sikorsky, stated in an affidavit that "[i]t is a fundamental tenet of blueprint reading that a Note applies to the entire drawing unless it states otherwise. There is no question that Note 7 governs thickness of the tip cap skin throughout the drawing because it does not state any limitation otherwise." (Meyer Aff. ¶ 5.)

The plaintiff's expert states that the growth of the tip cap's crack suggests additional stresses upon the tip cap which may reflect further defects. · (Eagar Aff. ¶ 20.) Specifically, he asserts that the defendants improperly lacked a screw tightening sequence and probably misaligned the screw holes in the tip cap fairing. (Id. ¶¶ 21–24, 27.) He noted that the Coast Guard, in a report stemming from this incident, stated:

> Recommendations ... for DPRO Sikorsky:
>
> (1) Revise tip cap installation procedures as needed to assure there is no interference with following areas: tip block, weights, rosan inserts, excess primer, excess adhesive, and attachment screws (hole alignment).

> (2) Establish tip cap fastener tightening sequence to assure no lateral preload occurs between screws and tip cap.
>
> . . .
>
> (4) Revise spare tip cap manufacturing process, as needed, to assure universal fit regarding screw hole location.

(Eagar Aff. ¶ 21, Ex. C ¶ 11.) In addition, the government's engineering report noted that "there was a discrepancy in the fit between the tip cap and the main rotor blade." (Eagar Aff., Ex. D at 3.) In another document, a Coast Guard commander noted:

> NADEP Cherry Point expressed their concern with the type of fastener system used by the tip cap assembly, the absence of guidance from Sikorsky on tightening sequence for the fasteners, the points of contact between the tip cap fairing and the Main Rotor Blade, and questioned the tolerance/accuracy of the production fixture used to make "spare" tip cap fairings and its match with holes made by the primary Main Rotor Blade/ Tip Cap hole drilling fixture because of the increasing problem with hole alignment of new spare tip caps to previous production main rotor blades.

(Eagar Aff., Ex. F.) A Sikorsky document about the incident indicates that the bottomside tip-block screw holes were elongated and distressed, while the topside holes were in good condition, (Eagar Aff., Ex. G), which Eagar interprets to mean that the screw holes in the tip cap fairing were probably misaligned. (Id. ¶ 24.)

Defendants contend that none of the plaintiff's assertions about the installation, screw tightening, or alignment of the tip cap is relevant to this case. Defendants state that, because the tip cap which failed was installed by the Coast Guard rather than by the defendants, the defendants cannot be faulted for any problems related to installation. (Defs.' Reply Mem. at 6; Potts Supplemental Aff. ¶¶ 8, 9.) Phillip Potts, a UTC official who oversaw the design of rotor systems including tip caps, stated in his affidavit that the Coast Guard

used its own manual for installation of replacement tip caps. He added that the Coast Guard's manual notes that a tip cap replacement may not identically match the fit of the original tip cap and provides instructions on how Coast Guard mechanics should align screw holes. (Potts Supplemental Aff. ¶ 8; Defs.' Doc.App., Ex. 24.[1]) Potts stated that the Coast Guard manual, which is under the exclusive control of the Coast Guard, would have been the appropriate place for a screw tightening requirement in this case and that the Coast Guard is familiar with screw tightening procedures. (Potts Supplemental Aff. ¶ 9; see Defs.' Doc.App., Ex. 25, ¶ 8.21.) Finally, defendants point out that a U.S. Navy report concluded in this case, "No material deficiencies or abnormalities were noted that would have predisposed this tip cap to fail." (Defs.' Doc.App., Ex. 16, ¶ 108; Meyer Aff. ¶ 6.)

Before turning to the issue of whether the defendants meet the requirements of the government contractor defense, I will consider plaintiff's motion to strike, which will in turn determine the evidence I may draw upon in deciding the defendants' motion for summary judgment.

## II. MOTION TO STRIKE

The plaintiff moves to strike all of the defendants' affidavits because of alleged deficiencies in form. Specifically, plaintiff asserts that the affidavits are not signed under the pains and penalties of perjury and do not indicate in which state or county they were signed. He further asserts that the affidavit of Charles C. Crawford does not state that it was sworn to. (Pl.'s Mot. to Strike, ¶ I.) I will not strike defendants' affidavits on these grounds.

Some of plaintiff's allegations are simply wrong. The affidavit of Charles C. Crawford begins by stating that Crawford "after first being sworn by me did under oath state the following." (Crawford Aff.) All of the affidavits except Crawford's indicate in the caption that they were signed and sealed in Fairfield County, Connecticut, and the seal on Crawford's affidavit says Fulton County, Georgia. Furthermore, all of the affidavits except Crawford's, which is even more explicit, say that the witness was "duly sworn." While the affidavits do not explicitly say that they were signed "under the pains and penalties of perjury," that standard is implied in the fact that the witnesses were "duly sworn." I will not disregard the affidavits purely on the basis of word choice.

In addition, plaintiff moves to strike seven individual portions of defendants' affidavits, asserting that they contain statements not within the personal knowledge of the witness or that they contain inadmissible hearsay. Defendants contend that the plaintiff waived the right to challenge defendants' affidavits when he withdrew his notice for depositions of defendants' witnesses. (Sikorsky Aircraft's Mem. of Law in Opp'n to Pl.'s Mot. to Strike Affidavits at 2–3.) However, defendants cite no case law to support this proposition. Further, plaintiff withdrew the deposition notices after learning that he could not compel the defendants' witnesses to appear in Boston for the depositions, suggesting that the reason for the withdrawal might be the cost of traveling to Connecticut for the depositions. (See Defs.' Doc.App., Exs. 26–28.) I will not find plaintiff to have waived all rights to challenge defendants' evidence simply because he chose to limit his own discovery. However, defendant is correct in asserting that plaintiff, without having deposed defendants' witnesses, has little independent basis upon which to determine the scope of

1. While the excerpts from the Coast Guard manual do contain instructions for attaching a tip cap, there is no explicit reference to the tip cap replacement not matching the fit of the original tip cap. The manual does state relevantly: "MRB's repaired at NADEP facilities may have used NPN517-3-5 screws in tip cap positions requiring the use of NAS7203P5 screws ....... NPN517 screws are an authorized alternate, NAS203P5 are the preferred part." (Defs.' Doc.App., Ex. 24 at 4.)

their personal knowledge. With that caveat, I will proceed to briefly examine the individual passages challenged by plaintiff.

In ruling upon a summary judgment motion, I may consider only admissible evidence. *See, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir.1990). Specifically, I may not consider inadmissible hearsay. *Id.* at 50. Further, affidavits must be made on personal knowledge. Fed.R.Civ.P 56(e). Fed.R.Evid. 803(8) provides a relevant exception to the hearsay rule for:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . ., or (C) in civil actions and proceedings . . ., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

■ **A.** Plaintiff challenges the first and second sentence of ¶ 14 of the affidavit of Phillip Potts, in which Potts states that the government "decided upon the tip cap design following an exhaustive multi-year development program" and that the government "did more than 'rubberstamp' the Blackhawk design since it conducted several design reviews. . . ." Potts asserted in his affidavit that he has worked for Sikorsky since 1972 and worked with the rotors group, which designed tip caps, since 1980. (Potts Aff. ¶¶ 1, 2.) Potts stated that he has personal knowledge of the design, manufacture and delivery of the tip caps, (*Id.* ¶ 2), and it is reasonable to assume, absent any contrary evidence, that this personal knowledge extends to Sikorsky's interaction with the government in the design and manufacture of these parts. As a result, I will not exclude the contested sentences as outside Potts' personal knowledge. These sentences certainly do not contain hearsay, as they describe what the government did, rather than setting out statements of others to assert the truth of those statements.

■ **B.** Plaintiff next challenges the fourth and fifth sentences of ¶ 17 of Potts' affidavit, in which Potts states that "Government and Sikorsky investigators agreed" that cracks in the tip cap stemmed from stress on the part and that the crack was not related to any manufacturing problem. Certainly, plaintiff is correct in asserting that Potts could not know what the government believed and therefore can only know of the government's agreement through statements of government officials. As such, his assertion of the government's agreement is hearsay because it relates a statement by the government for the truth of that statement. However, government officials related the conclusion that the cracking stemmed from stress and not from a manufacturing defect in a Navy letter admissible as a government document under Fed.R.Evid. 803(8). (Defs.' Doc.App., Ex. 16, ¶¶ 10A, 10D.) These conclusions are themselves admissible and form the basis for Potts to make an admissible statement that the government agreed with Sikorsky. Plaintiff also asserts that Potts' statements are inadmissible because he has not been qualified as an expert to give an opinion as to the source of the cracking. However, Potts did not in fact give his own opinion, instead relating what investigators concluded, so his expert status is irrelevant.

■ **C.** Plaintiff moves to strike the third and fourth sentence of ¶ 6 of the affidavit of James Thach III, in which he states that in the course of a trip to the Coast Guard's Aircraft Repair and Supply Center in North Carolina to look at cracked tip caps, "[w]e discussed that the Navy was experiencing similar premature cracking on their Seahawks. The Coast Guard, Navy and Sikorsky all agreed that the manufacturing process was not an issue and that the stresses on the tip cap were causing cracking at certain of the

screw holes." Here, Thach appears to be relating specific statements made to him by personnel he encountered at the Aircraft Repair and Supply Center, and defendants evidently seek to admit these statements for their truth. As a result, I find these statements to be inadmissible hearsay. The government document exception is of no use here because Thach's statements relate what was told to him personally, rather than reflecting government documents he has seen that are independently admissible.

**D.** Plaintiff moves to strike ¶ 8 of the affidavit of Frederick Brisbois as inadmissible hearsay. Brisbois' statement that the military agreed about the cause of cracking is admissible because it was based, in this case explicitly, on admissible government documents, as explained above. (*See* Brisbois Aff. ¶ 8; Defs.' Doc. App., Ex. 16 ¶¶ 10A, 10D.) His statements about the military discussing possible design changes and eventually deciding upon a composite "doubler" are admissible because they relate what the government did (i.e., discussed and decided), which Brisbois asserts he knew about personally. Brisbois does not relate statements made by the military in the course of these discussions, and defendants do not attempt to assert the truth of any such statements. As a result, this paragraph is admissible.

**E.** Plaintiff challenges as hearsay the second sentence of ¶ 9 of Brisbois' affidavit in which he states that the military agreed with Sikorsky's recommendation that the military pay particular attention to the area of attachment screws when performing inspections. A government inspection document provided by defendants explicitly states that inspectors should "pay particular attention to attachment screw area." (Defs.' Doc.App., Ex. 30, ¶ 5e(2).) Because this document is admissible under Fed.R.Evid. 803(8) and Brisbois' statement is based upon the document, his statement is admissible.

**F.** Plaintiff moves to strike ¶ 10 of Brisbois' affidavit, which states:

When the tip caps continued to crack, even with the larger composite doubler, the military began to consider changing to an all composite tip cap. These discussions were well under way before this incident. Thus, the military had already decided that the composite doubler and inspection program was insufficient to prevent premature fatigue cracking.

Once again, with the first two sentences of this paragraph, Brisbois states what the military did (i.e., consider and discuss), rather than relating statements by the military for the truth of those statements, so these sentences do not constitute hearsay. While it is not entirely clear how Brisbois, a Sikorsky employee, would have personal knowledge of internal military discussions, it is not inconceivable that, as Deputy Program Manager for Safety at Sikorsky, he was updated as to the government's discussions about safety issues related to Sikorsky products. I have no basis to assume that he lacked personal knowledge of the substance of these first two sentences, so I find them to be admissible. The third sentence, which relates the conclusion that the military came to, does appear to present hearsay, but, as defendants point out, the substance of that sentence is contained in a letter from the Coast Guard upon which Brisbois could have relied. (*See* Eagar Aff., Ex. E ¶ 4a.) Because the Coast Guard letter, here attached by plaintiff's expert, is admissible as a government document, Brisbois' statement apparently referencing it is admissible as well.

**G.** Plaintiff moves to strike ¶¶ 18 and 19 of the affidavit of William F. Schlenk, in which Schlenk describes various levels of government review of design and production by Sikorsky, as well as testing of products made by Sikorsky. Plaintiff argues that these paragraphs do not apply specifically to the helicopter and parts at issue, that they are outside of Schlenk's personal knowledge, and that they are conclusory and speculative. Schlenk's statements in these two paragraphs do indeed describe general review and testing proce-

dures, rather than the specific procedures applied to the products at issue in this case. The paragraphs are still relevant, however, as the procedure generally used may reflect the procedure applied in the specific circumstances of this case. I find nothing conclusory or speculative in a description of regular review and testing procedures. Moreover, since Schlenk asserts that he has personal knowledge of the procurement process, specifications, and requirements for the UH–60A and HH–60J helicopters and that he had responsibility to make sure that these helicopters complied with government specifications, (Schlenk Aff. ¶ 1), it is reasonable to conclude that he has personal knowledge of the government's review and testing procedures. I find these paragraphs to be admissible.

## III. SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal quotations and citations omitted).

### B. Eagar's Affidavits

Before moving to the substance of this motion, I will briefly consider the defendants' request that I reject Thomas Eagar's affidavits because they do not satisfy the threshold for competency set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Supreme Court in *Daubert* stated that a trial judge, in evaluating potential scientific expert testimony, must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at 592, 113 S.Ct. 2786. In *Kumho Tire*, the Court held that the same gate-keeping inquiry which applies to pure scientific testimony also applies to an engineering expert's experience-based analysis. 119 S.Ct. at 1174–76. The Court also held that a series of non-exclusive factors identified in *Daubert* may be applied, if appropriate, to experience-based technical or scientific testimony. *Id.* at 1175–76. These factors are: (1) whether "a theory or technique ... can be (and has been) tested"; (2) whether that theory or technique has been the subject of peer review and publication; (3) whether a technique is subject to a "known or potential rate of error" and whether standards exist for the operation of that technique; and (4) "whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community'." *Id.* at 1175 (quoting *Daubert*, 509 U.S. at 592–94, 113 S.Ct. 2786).

I note first that Eagar's credentials as an academic and a court expert are impec-

cable. As *Daubert* makes clear, however, an inquiry into the reliability of expert scientific testimony does not end with the credentials of the expert, so I will consider the factors identified above for evaluating expert testimony. I find applying the factors set out in *Daubert* and *Kumho Tire* to Eagar's affidavits to be a difficult exercise because the affidavits contain very few identifiable techniques or theories. Eagar primarily appears to have read government reports and plans and drawn conclusions based on his reading. He is acting essentially as an interpreter of engineering documents. As such, he does not appear to be relying on a method subject to testing, peer review, or publication. Further, any rate of error or level of acceptance is the result of Eagar's individual ability to interpret and his specific execution in this case, rather than the strength of a theory or technique.

The Court in *Kumho Tire* upheld the district court's finding that a tire expert's analysis of a visual and tactile inspection of a tire was unreliable based on similar grounds to those the defendant urges here. Specifically, the lower court had found unreliable "the scientific basis, if any, for such an analysis," and the Supreme Court noted that the theoretical basis of the contested testimony was weak and that the proposed expert's uncertainty about important issues was too great to support a finding of reliability. 119 S.Ct. at 1176–77. In that case, as in this one, the technique at issue was simply an interpretation of readily accessible information. The defendants here assert that, as in *Kumho Tire,* Eagar's affidavits indicate frequent errors, a misunderstanding of the relevant plans and documents, and untenable conclusions.

I find the defendant's contentions to carry some weight. Eagar's affidavits do not show signs of an exhaustive or careful examination, nor do they indicate the use of any scientific theories or techniques which have been shown to be reliable. Further, as explained below, I find that his conclusions are not supported by signifi-

cant evidence. As such, I would be hard pressed to find that Eagar's affidavits present scientific knowledge helpful to the trier of fact, and I would be inclined not to allow Eagar to be presented to a jury without, at a minimum, substantial sharpening of his proposed testimony. However, Eagar's affidavit provides the primary basis for the plaintiff's opposition to the summary judgment motion, and Eagar's conclusions might be suggested by several documents he cites. Accordingly, in order to insure a full consideration of plaintiff's position, I will consider his affidavits in my summary judgment analysis.

## C. The Government Contractor Defense

The Supreme Court outlined the government contractor defense in 1988 in *Boyle v. United Techs. Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Court reasoned that the liability of independent contractors performing an obligation for the government implicates "uniquely federal" interests similar to those implicated by the liability of government officials and is therefore governed by federal law. *Id.* at 505–06, 108 S.Ct. 2510. The Court found that liability on the part of government contractors may create a " 'significant conflict' between federal interests and state law." *Id.* at 511, 108 S.Ct. 2510.

Specifically, the Court noted that in the Federal Tort Claims Act, Congress authorized plaintiffs to recover damages from the United States for harm caused by negligent or wrongful conduct of government employees, but excepted from this consent to suit, "any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* (quoting 28 U.S.C. § 1346(b)). The Court found that the military's selection of appropriate designs for military equipment is a discretionary function protected from liability by this provi-

sion. *Id.* The Court further reasoned that "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production," in which case the added costs of liability would be passed through to the government anyway. *Id.* at 511–12, 108 S.Ct. 2510.

■ The Court in *Boyle* formulated a three-part test for determining when the government contractor defense applies:

Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. 2510. The first two of these conditions ensure that the design of the equipment at issue constituted a "discretionary function" by the government, while the third condition counteracts any incentive for contractors to withhold knowledge of risks. *Id.*

The First Circuit has apparently never applied the government contractor defense, but various district and appellate courts in other circuits have elaborated on the three elements in the *Boyle* test and have applied the test to manufacturing defect and failure to warn claims as well as design defect claims,[2] as explained below. Courts have held that the government contractor defense may provide a basis for granting summary judgment. *See, e.g., Tate v. Boeing Helicopters,* 55 F.3d 1150, 1156 (6th Cir.1995) (affirming grant of summary judgment for design defect claim); *In re Aircraft Crash Litigation Frederick, Md., May 6, 1981,* 752 F.Supp. 1326, 1336 (S.D.Ohio 1990), *aff'd sub nom. Darling v. Boeing Co.,* 935 F.2d 269, 1991 WL 105753 (6th Cir.1991) ("There is no doubt that the *Boyle* defense can be established as a matter of law. Cases following *Boyle* have so held ... in the context of a motion for summary judgment....").

### D. Applying the *Boyle* Test

Plaintiff only contests the second condition of the *Boyle* test: conformance to specifications; accordingly, I will focus on that condition, but I will briefly touch upon the other two requirements.

■■ First, to show that the government approved reasonably precise specifications, defendants need not prove that the government itself formulated the specifications, but they must prove that the government did more than merely give a "rubber stamp" to defendants' own specifications. *See Tate,* 55 F.3d at 1154; *Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1480–81 (5th Cir.1989), *cert. denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). The *Boyle* test's first condition is satisfied, however, "where the government and the contractor engage in a 'continuous back and forth' review process regarding the design in question." *Tate,* 55 F.3d at 1154 (quoting *Harduvel v. General Dynamics Corp.,* 878 F.2d 1311, 1320 (11th Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990)). In this case, defendants, through affidavits of Sikorsky officials and a former senior engineer for the Army, produce evidence of an extensive 'continuous back and forth' review process between Sikorsky and the Army, Navy, and Coast Guard before the government gave final approval to the design for the helicopters at issue. (*See*

---

**2.** Plaintiff's claims all essentially boil down to claims of design defect, manufacturing defect, and failure to warn. Counts I and II (negligence and strict product liability) allege all three of these theories of liability; Count III (breach of warranties) is based on assertions of design and manufacturing defect; Count IV (failure to warn) is self-explanatory; and Count V (failure to recall) seems to be based on an allegation of design defect and perhaps on allegations of manufacturing defect.

Crawford Aff., Schlenk Aff., Potts Aff., Thach Aff., Brisbois Aff.) Plaintiff produces no evidence to the contrary. I find that defendants have established the first element of the government contractor defense.

While apparently conceding that the government approved reasonably precise specifications for the helicopter and tip cap at issue, plaintiff vigorously contests defendants' assertion that the parts at issue conformed to the government's specifications. Essentially, plaintiff asserts that defendants improperly manufactured the tip cap which cracked in this case such that it did not conform to the government's specifications. If plaintiff is correct, the government contractor defense does not apply. "A manufacturer's miscue in the manufacturing process—failure to conform to government design specifications—cannot be insulated from tort liability." *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 246 (5th Cir.1990). *See also Trevino,* 865 F.2d at 1481 n. 6 ("A manufacturer is liable for manufacturing defects no matter who designed or approved the specifications.")

■ However, it is worth noting that the second *Boyle* requirement does not simply mean that design defect claims are covered by the government contractor defense, while manufacturing defect claims are not. Where a contractor consciously varied the design of an item produced for the government from the government's specifications, a design defect claim could proceed despite the government's approval of specifications. Because there is no evidence in this case to support an assertion that the defendants disregarded the specified design in favor of an alternative design, I find that the defendants have established the second *Boyle* condition as it applies to plaintiff's design defect claims. I also note that some courts have found that manufacturing defect claims may be covered by the government contractor defense where the contractor followed government specifications in the process of manufacturing the product. *See Snell v. Bell Helicopter Textron, Inc.,* 107 F.3d 744, 749 (9th Cir.1997). This distinction does the defendants little good here; if the defendants produced a tip cap which does not conform to government design specifications, as plaintiff asserts, then the defendants have failed to establish the second *Boyle* condition regardless of whether they adhered to manufacturing specifications.

I will turn first to defendants' contention that the government's execution of a Form DD–250 Material Inspection and Receiving Report, which defendants have produced for the helicopters at issue in this case, (Defs.' Doc.App., Exs. 5, 9), conclusively establishes a product's conformance with government specifications. Several opinions lend support to this contention. A Southern District of New York opinion held in 1992 that "Evidence that the government inspected and accepted the products produced by the private contractor is sufficient to establish conformity with reasonably precise specifications." *Lewis v. Babcock Indus., Inc.,* 1992 WL 142751, at *7 (S.D.N.Y. June 8, 1992), *aff'd,* 985 F.2d 83 (2d Cir.1993), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993). And a Northern District of Texas opinion held that a plaintiff had not produced any evidence that the government's acceptance of the helicopter at issue was not correct, and, "[a]bsent such proof, the Court finds that pursuant to the contract and [Armed Services Procurement Regulation] 7–103.5, the DD250 acceptance conclusively established that [the] helicopter ... conformed to the contract specifications." *Hendrix v. Bell Helicopter Textron Inc.,* 634 F.Supp. 1551, 1557 (N.D.Tex.1986). *Cf. United States v. Cannon,* 41 F.3d 1462, 1469 (11th Cir.1995), *cert. denied,* 516 U.S. 823, 116 S.Ct. 86, 133 L.Ed.2d 44 (1995) (noting in reference to the DD–250 that the government "signs the form signifying acceptance and conformance of the goods").

■ The *Hendrix* court, however, makes an important distinction in holding that the DD–250 is proof of conformance

only absent any proof that the government's acceptance of the product was incorrect. *Hendrix*, 634 F.Supp. at 1557. In the case at hand, plaintiff argues that he has evidence that the product did not conform to specifications. I must then move beyond the DD–250 forms and consider the plaintiff's evidence. Indeed, I find persuasive the Supreme Court of Connecticut's statement that "[a]lthough we acknowledge that initial acceptance by the United States government, in the form of a signed DD–250, is some evidence that the aircraft complied with specifications, such preliminary acceptance cannot foreclose the possibility that the aircraft, in fact, was nonconforming." *Miller v. United Techs. Corp.*, 233 Conn. 732, 777, 660 A.2d 810 (1995). *See also Trevino*, 865 F.2d at 1480 n. 5 (noting, in connection to the first *Boyle* element, that the signature of government employee must not be enough by itself to establish approval because, if it was, contractors would bargain for a guaranteed signature to eliminate any possibility of liability.) I will examine the plaintiff's allegations of non-conformance.

Plaintiff asserts that the tip cap did not meet the thickness requirement specified by the government. Specifically, plaintiff argues that the government required that the tip cap be 0.063 inches thick, while the tip cap which cracked in this case was measured at 0.060 inches thick. The plaintiff's expert asserts that this five percent deficiency led the crack in the tip cap to grow faster than it would have otherwise, therefore increasing the chance that it would cause a problem before inspections revealed the crack. (Eagar Aff. ¶ 18.) The government report referenced by Eagar and apparently misidentified as a report prepared by the defendants states, "The fairing material averaged 0.060 inch thickness adjacent to the countersunk fastener area. The drawing requirements call for a nominal 0.063 inch thickness, however, stretch forming of the fairing could account for the reduction to the measured thickness." (Eagar Aff., Ex. D at 3.) Also relied upon by the plaintiff is a report

prepared by UTC in response to an earlier incident of tip cap cracking, which states, "Fairing wall thickness in several areas adjacent to the crack ranged between .059–.061 inch. The drawing calls for a .063 inch nominal stock thickness requirement. However, stretch forming and sanding generally reduce this, typically to the thickness measured." (Eagar Aff., Ex. H at 3.)

The defendants respond that the 0.063 inch thickness requirement is only for the unformed stock from which the tip cap fairing is to be fashioned, while the government has specified that the finished product need only be 0.052 inches thick. (Defs.' Reply Mem. at 5–6.) The design drawing which defendants point to for support is, as noted above, complex. Note 7 to the drawing states, "Minimum sheet thickness prior to stretch forming .059. Minimum thickness after stretch forming and prior to chemical etch .052." (Design Drawing 70150–09107, Ex. 23 to Defs.' Doc.App.) I do not observe the drawing to indicate specifically which part this specification applies to and Eagar appears to assert that the note does not conclusively provide this information. (Eagar Third Aff. ¶ 8.) However, Meyer asserts in his affidavit that a note to a blueprint applies to the entire drawing unless explicitly limited and that Note 7 therefore applies to the thickness of the skin of the entire tip cap. (Meyer Aff. ¶ 5.) The defendants explained the presence of the three different thickness requirements (0.063, 0.059, and 0.052 inches) in oral argument, asserting that they represent three different stages in production of tip caps—unformed stock, aluminum which has gone through some processing but not stretch forming, and aluminum after stretch forming. I note that the number 0.063 does show up at least twice on the plan, once clearly marked as "stock," suggesting the required thickness before forming, but once (the time highlighted by defendants) next to what might be a finished product. Finally, the defendants' witness Potts, states

in his affidavit that the 0.063 inch thickness requirement applies only to aluminum stock as purchased and that the requirement for the finished product is 0.052 inches, thus supporting defendants' interpretation. (Potts Supplemental Aff. ¶¶ 4–6.)

■ The fact that both the government, in a report following the accident, and UTC, in an earlier report, state that the design drawing requires a nominal thickness of 0.063 without mentioning that the drawing sets out a different specification for the thickness of the finished product might at first blush call into question defendants' interpretation of the design drawing. (Eagar Aff., Exs. D at 3, H at 3.) Yet both of these reports also note that stretch forming could reduce the thickness of the aluminum, and the UTC report indicates that stretch forming in fact normally reduces the thickness to 0.059–0.061 inches. (*Id.*) To be sure, the fact that stretch forming normally has a thinning effect is not dispositive; if the only thickness requirement given for the tip cap fairing is in fact 0.063, then defendants did not conform to that requirement in this case, regardless of whether this tip cap is the same as most tip caps that they produce.

It is important to observe that neither of the reports quoted state explicitly that the tip cap at issue violated specifications. Moreover, the relevant plan appears to be entirely consistent with the defendants' explanation of multiple thickness requirements, and the government and UTC reports are not inconsistent with such an interpretation. Potts' and Meyer's affidavits lend further support to the defendants' version and appear to provide a clear refutation of Eagar's assertion that the plans are insufficient to confirm or deny the applicability of the 0.052 inch thickness requirement. Finally, a Navy report appears to conclude that the tip cap at issue had "no material deficiencies or abnormalities." (Defs.' Doc.App., Ex. 16, ¶ 10B; Meyer Aff. ¶ 6.)

A clear explanation in an admissible document (rather than in argument) of where and when each of the three different thickness requirements applies would have made resolution of this issue more straightforward. Nonetheless, after careful review, I find that the plaintiff has produced no evidence creating a genuine issue of material fact as to any violation by the defendants of a tip cap thickness requirement. The reports are not inconsistent with the defendants' position, and I do not find that Eagar's affidavits provide any convincing evidentiary or theoretical support for an opposing position. Accordingly, I find that the defendants have met the second element of the *Boyle* test as to the thickness of the tip cap because they conformed to the government's thickness specifications.

■ The plaintiff's expert also asserts that the growth of the crack suggests further stresses upon the tip cap, which he argues were likely caused by defendants' failure to implement a screw tightening sequence and misaligning the screw holes in the tip cap fairing. (Eagar Aff. ¶¶ 20–24, 27.) However, defendants point out, persuasively, that the tip cap in this case was not installed by defendants, but rather by the Coast Guard as a replacement and in accordance with the instructions in the Coast Guard's own manual. (Potts Supplemental Aff. ¶¶ 8–9.) As a result, improper screw tightening or misalignment of screws suggests an error in assembly rather than design, to be sure, but one by the Coast Guard rather than by the defendants.

Plaintiff can produce little evidence to counter this seemingly fatal flaw in its assembly argument. Plaintiff points to the Coast Guard's recommendations to Sikorsky following the accident which call for Sikorsky to revise tip cap installation procedures, establish a screw tightening sequence, and revise the tip cap manufacturing process to assure universal fit of screw holes in the tip cap. (Eagar Aff., Ex. C

¶ 11.) The fact that these post hoc recommendations were aimed at Sikorsky does not provide evidentiary support for the proposition that the Coast Guard allocated some responsibility to Sikorsky for the installation problems. In any event, if defendants did not perform the installation—and no evidence has been produced to suggest that they did—then they cannot be found to have performed it in violation of government specifications. The fact that the Coast Guard made a series of recommendations for changes after the accident suggests that there were no specifications before the accident requiring Sikorsky to come up with a screw tightening sequence or to manufacture tip caps with screw holes that assured universal fit.

A government report finding a discrepancy in fit between the tip cap and the rotor blade and a Sikorsky document indicating screw positions which suggest that the screw holes in the tip cap fairing were misaligned are no more helpful to the plaintiff. (Eagar Aff. ¶ 24, Ex. D at 3, Ex. G.) These documents suggest problems with the installation by the Coast Guard or difficulties to be addressed in the future, but not failures on defendants' part to conform to government regulations. In another document slightly more troubling for defendants, a Coast Guard commander wrote:

> NADEP Cherry Point expressed their concern with the type of fastener system used by the tip cap assembly, the absence of guidance from Sikorsky on tightening sequence for the fasteners,

the points of contact between the tip cap fairing and the Main Rotor Blade, and questioned the tolerance/accuracy of the production fixture used to make 'spare' tip cap fairings and its match with holes made by the primary Main Rotor Blade/Tip Cap hole drilling fixture because of the increasing problem with hole alignment of new spare tip caps to previous production main rotor blades.

(Eagar Aff., Ex. F.) Here, the Coast Guard commander seems to be implying that the manufacturing of the fairing was imperfect (had problems with "tolerance/accuracy"). Nonetheless, this passage too fails to establish that the tip cap at issue did not conform to government specification. Instead, the commander appears to criticize the Coast Guard's assembly, as well as to mandate future guidance from Sikorsky as to screw tightening sequence and greater attention by Sikorsky to manufacturing replacement tip cap fairings for attachment to existing rotor blades—which was not necessarily an objective at all when the tip cap in question was manufactured, because it was built for a specific helicopter rather than as a replacement. The documents plaintiff has produced suggest steps that defendants could have taken to make their product safer. However, these documents do not overcome the fact that the Coast Guard performed the installation of the tip cap. Plaintiff has not pointed to any failure on defendants' part to conform to government specifications in its failure to provide a screw tightening sequence or in its alignment of the screw holes.[3] I find that

**3.** My analysis is not altered by Eagar's assertions that the same specifications apply to Army and Coast Guard tip caps with the exception of color and that "interchangeability" between tip caps and helicopters is mandatory. (Eagar Third Aff. ¶¶ 2–6, Ex. 1.) First, this argument does not address any problems resulting from installation by the Coast Guard or, for that matter, from the screw tightening sequence. In addition, evidence that the same specifications applied to Army and Coast Guard tip caps does not translate to evidence of a defect in this case. To make such a leap, I would have to infer that the possible misalignment of screw holes of a tip

cap from an Army helicopter when attached to a Coast Guard helicopter resulted from a failure to meet design specifications in the tip cap—based only on the fact that all tip caps should meet the same specifications. No evidence supports such a leap, as any misalignment that did occur may have resulted from the attachment or from earlier use of the tip cap. Further, the defendants assert that the mandatory interchangeability required in Note 1 of the design drawing included as Exhibit 1 to Eagar's Third Affidavit refers to tools and manufacturing processes, rather than to the interchangeability of tip caps and

the plaintiff has not established a genuine issue of material fact as to non-conformance with government specifications other than for the thickness of the tip cap fairing.

 Finally, to meet the third requirement of the *Boyle* test, defendants must show that they warned the government about dangers known to them in the use of the equipment. The contractor's duty to warn only extends to dangers of which it has actual knowledge and of which the government is not aware. *See Sundstrom v. McDonnell Douglas Corp.*, 816 F.Supp. 587, 590 (N.D.Cal.1993). Defendants' witnesses, including a former senior engineer for the Army, state that defendants never withheld from the government any relevant information about the Blackhawk or Jayhawk helicopters or about tip cap cracking. (Crawford Aff. ¶ 10; Potts Aff. ¶ 19; Thach Aff. ¶ 8; Brisbois Aff. ¶ 11.) Plaintiff has produced no evidence which suggests otherwise. Plaintiff includes a report prepared by UTC for the Army in 1988 addressing a premature tip cap crack, as well as an Army response finding UTC's report inadequate because it failed to explain why the tip cap cracked or to present a way to solve the problem for existing helicopters. (Eagar Aff., Ex. H.) While these documents suggest that the defendants did not address the tip cap problem as quickly or effectively as the Army would have liked, they do not indicate that defendants failed to warn the government of any dangers.[4] If anything, these documents reflect early and frequent communication between defendants and the government about the tip cap problem and suggest that the defendants knew too little, rather than too much, about the potential dangers the tip caps presented.

I find that defendants have established all three *Boyle* requirements. As a result, I will grant summary judgment on Counts I, II, III, and V to the extent that they assert theories of design defect or manufacturing defect. I will consider plaintiff's failure to warn claims separately.

### E. Failure to Warn Claims

The plaintiff asserts that defendants cannot establish the government contractor defense for failure to warn claims merely by establishing the elements of the *Boyle* test for design defect claims. Defendants argue that state law failure to warn claims are preempted when the contractor establishes that the government approved design specifications for a product and that plaintiff here did not in fact state any failure to warn claims.

Massachusetts recognizes common law failure to warn claims. *See doCanto v. Ametek*, 367 Mass. 776, 785, 328 N.E.2d 873 (1975). Various courts have found that the government contractor defense may apply to failure to warn claims, but that in order for defendants "to establish that *Boyle* displaces any state law duty to warn, [defendants] must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law." *In re Joint Eastern & Southern Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 630 (2d Cir.1990). *See also Tate*, 55 F.3d at 1157 ("[W]hen the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability."); *Yeroshefsky v. Unisys Corp.*, 962 F.Supp. 710, 718 (D.Md. 1997) (adopting the 6th Circuit's analysis

---

helicopters. (Meyer Aff. ¶ 4.) While Eagar's interpretation of this note is not implausible, he does not provide any supporting evidence for it, and, even if correct, it would not necessarily indicate a defect in this case. Accordingly, I do not find that the plaintiff's interpretation provides a genuine issue of material fact as to non-conformance with any government specification.

4. Nor do these documents necessarily suggest failure to conform to specifications; they simply show that the government expected UTC to explain why its products, apparently designed and built according to specifications, did not perform as they were supposed to.

in *Tate* ). Applying this type of analysis, "[t]he possibility remains that while the government contract may focus on the content and design of the product, the issue of warnings was left to the contractor's discretion," meaning that the . government contractor defense will apply to design defect claims but not to failure to warn claims. *Ritch v. AM Gen. Corp.*, 1996 WL 310297, at *3 (D.N.H. Mar.28, 1996). *But see Russek v. Unisys Corp.*, 921 F.Supp. 1277, 1293–94 (D.N.J.1996) (adopting the approach that "where the manufacturer has established a *Boyle* defense as to the design defect, and the relevant specifications are silent as to warnings, *Boyle* bars the failure to warn claims as well").

It is not necessary for me to resolve exactly how to apply the *Boyle* test to failure to warn claims. I note first that, to the extent that Massachusetts law permits a claim for the defendants' failure to warn the Coast Guard, summary judgment as to that claim is appropriate on this record. As set out above, defendants have established that they passed on to the government any information they possessed concerning dangers presented by the helicopters and tip caps at issue, and plaintiff has produced no evidence indicating that defendants withheld any such information.

■ The only remaining issue, then, for a failure to warn claim is defendants' failure to warn Quiles himself of the potential dangers presented by the tip cap on his helicopter. However, that information would have been useless to Quiles. As one court noted in a similar case, Quiles, "as a military officer who must follow orders, could not have refused to fly even if defendants had warned him" that the tip cap in his helicopter presented a potential dan-

ger. *Sundstrom*, 816 F.Supp. at 596. Quiles has not presented any evidence suggesting that a warning could have had any beneficial effect. Accordingly, summary judgment is appropriate on plaintiff's failure to warn claims.

Thus, even if I were to apply *Tate*, which I am inclined to find the most compelling approach to this issue [5], and find that elements of the government contractor defense have not been established as to the failure to warn . claims in this case, because plaintiff has not presented any claim or argument to suggest that a warning would be appropriate or effective, I will grant defendants' motion for summary judgment as to plaintiff's failure to warn claims.

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's motion to strike is GRANTED as to the third and fourth sentences of ¶ 6 of the affidavit of James Thach III, but otherwise DENIED.

2. Defendants' motion for summary judgment is GRANTED.

---

5. As noted above, some courts find that the government contractor defense preempts failure to warn claims whenever the defense applies to design defect claims and the specifications are silent about warnings. *Russek*, 921 F.Supp. at 1293–94. On the opposite extreme, some other courts imply a requirement that the government prohibit warnings before the defense may be invoked for a failure to warn claim. *See Yeroshefsky*, 962 F.Supp. at 717–18 (surveying different circuits' approaches to this issue). I find the 6th Circuit's approach in *Tate* the most compelling since it embodies the requirement of government discretion that was central to the Supreme Court's holding in *Boyle.*